In the Matter of ROBERT MCMAHON, as Executive Director and Administrator of St. Christopher's Home, Sea Cliff, New York, on Behalf of DAVID SINGLETON, et al., Respondents, v AMITYVILLE UNION FREE SCHOOL DISTRICT, Appellant.

Second Department, May 19, 1975

*L. Van Nostrand, Jr.,* for appellant.

*Fritz, O'Brien & Farrell (Joseph R. Carrieri* of counsel), for respondents.

*Louis J. Lefkowitz, Attorney-General (Robert E. Keyes* of counsel), for State Board of Social Welfare, *amicus curiae.*

SHAPIRO, J. Amityville Union Free School District (the District) appeals from a judgment of the Supreme Court, Nassau County, which directed it to accept the infant petitioners into the appropriate schools under its jurisdiction as fully matriculated students pursuant to paragraph a of subdivision 5 of section 3202 of the Education Law and which further directed that the cost of their instruction be computed and borne in accordance with that section. We affirm the judgment.

### THE QUESTION AT ISSUE

Was the District required to accept these children as fully matriculated students when they lived in the school district in a "group home" substantially funded by the social services district?

### THE FACTS

The petitioners are eight black children (two sets of siblings)

residing in a group home[1] in East Massapequa, an area embraced within the confines of the School District. These children were placed by their parents (residents of New York City) with the Commissioner of Social Services of the City of New York, who, in turn, placed them with St. Christopher's Home, an "authorized agency",[2] located in Sea Cliff, on the north shore of Nassau County. St. Christopher's Home in turn established the group home in order that these children might be kept together in a family and community type atmosphere.

The confrontation between St. Christopher Home's effort to enroll the children and the District's refusal to accept them took place in October, 1974. As a result, this proceeding pursuant to CPLR article 78 was instituted, which resulted in the judgment appealed from directing the district to enroll the children.

The odyssey of the children began in New York City. There, the three Singleton children, David, Anthony and Theresa, had been placed with the Commissioner of Social Services of the City of New York by their mother, Betty Singleton, a resident of Brooklyn, New York. They were born on March 17, 1964, April 14, 1967 and March 28, 1969, respectively.

The Willis children had been placed with the Commissioner of Social Services of the City of New York by their parents, Robert and Patricia Willis, residents of The Bronx, New York. The five Willis children, Robert, Tracy, Troy, Lamond and Marcia, were born on September 12, 1963, September 20, 1964, April 28, 1966, December 20, 1968 and October 9, 1967, respectively.

Thus, all of the infant petitioners are dependent children

---

1. Subdivision 17 of section 371 of the Social Services Law provides: "17. 'Group home' shall mean a facility for the care and maintenance of not less than seven nor more than twelve children, who are at least five years of age, operated by an authorized agency except that such minimum age shall not be applicable to siblings placed in the same facility."

2. Subdivision 10 of section 371 of the Social Services Law provides:

"10. 'Authorized agency' means

"(a) Any agency, association, corporation, institution, society or other organization which is incorporated or organized under the laws of this state with corporate power or empowered by law to care for, to place out or to board out children, which actually has its place of business or plant in this state and which is approved, visited, inspected and supervised by the board or which shall submit and consent to the approval, visitation, inspection and supervision of the board as to any and all acts in relation to the welfare of children performed or to be performed under this title,

"(b) Any court or any public welfare official of this state authorized by law to place out or to board out children".

voluntarily committed to the Commissioner of Social Services of the City of New York and all were of elementary school age in October, 1974. Also living with the Singleton and Willis children is one further below-school-age sibling from each family. The petition states that the natural parents of the children "will not be able to provide the care, custody and control of said children for several years, if ever, and long-term foster care is indicated in this situation."

The choices facing the executive director of St. Christopher's Home were manifestly not simple. Clearly, it would be in the best interest of the children both to avoid separating brothers and sisters and to avoid placing them in an institutional environment. However, since it was no easy matter to place sets of six and four children, St. Christopher's Home decided to establish a group home.

Accordingly, it leased a house at 10 Lake Street, East Massapequa, Nassau County, for a term of 15 years, commencing October 10, 1974, at a rental of $810 per month, with all town, school and other taxes to be paid by it. The children were then placed in the Lake Street house under the care of Douglas and Arlene O'Dell, employed to supervise the children and to act as their surrogate parents. Mr. and Mrs. O'Dell have no children of their own and live and sleep in the Lake Street house with the Willis and Singleton children and care for them as if they were their own children.

The petition states that it was the intention of St. Christopher's Home to have the group home set up in theory, size, appearance and structure to resemble a family home.

On October 28, 1974, three of the children, David Singleton, Tracy Willis and Robert Jerome Willis, were registered in Grades 4 and 5 in the Park Avenue Elementary School within the School District. They attended their first class on October 29, 1974. However, the next day St. Christopher's Home was notified by the school authorities that the three boys could no longer attend this school.

On October 29, 1974, two more of the boys, Anthony Singleton and Troy Willis, were registered at the Northwest Elementary School, within the School District, but shortly thereafter, Mr. and Mrs. O'Dell were told not to bring them to school and by letter dated October 29, 1974 the District's attorneys advised the executive director of St. Christopher's Home that none of the children in the Lake Street house would be accepted for matriculation in the District's schools. The rea-

sons given for denying matriculation to the children were, in essence, that they were not residents of the District and that the District wished to maintain racial balance, prevent overcrowding and minimize potential cost for special instruction.

The District claims that the children may not attend Amityville public schools for two reasons:

*First:* As residents of a group home the children are not residents of a "family home" as specified in subdivision 5 of section 3202 of the Education Law. Further, the group home is actually in the nature of an annex of an institution located in Sea Cliff and the "logical choice" for the children's education is the district schools of Sea Cliff.

*Second:* In 1965 the District was found by the State Commissioner of Education to be racially imbalanced. Thereafter, the District's efforts to correct that imbalance resulted in a condition in which the former minority now constitutes 50.8% of the over-all school population and 52% of the elementary school population. Under these circumstances, the District contends that admission of the eight infant petitioners would (a) tip the "delicate" racial balance, (b) cause white families to flee the District and (c) result in a segregated school system, a condition which both it and (allegedly) St. Christopher's Home have an affirmative constitutional duty to avoid.

In 1965 the District's elementary school enrollment and breakdowns by race were:

| | |
|---|---|
| Total K through 5 enrollment | 2219 |
| Majority enrollment | 1317 |
| Minority enrollment | 906 |
| Percentage of minority | 40% |
| Percentage of majority | 60% |

The order of the Commissioner of Education declaring the Amityville Public Schools racially imbalanced was issued on December 21, 1965 and at that time the District was ordered to develop and implement a plan for desegregating its schools by the fall of 1966.

The plan subsequently developed and implemented was the so-called "Princeton Plan". All of the kindergarten and first grade students were concentrated in the District's Northeast building; all of the second and third grade students were

concentrated in the Northwest building; and all of the fourth and fifth grade students were concentrated in the Park South and Park Central schools. By this reorganization, each school in the District represented the racial composition of the age group of the District attending public schools. That plan is still in effect and, according to the District, is operating successfully.

In 1974 the elementary school enrollment and breakdown by race were:

| | |
|---|---|
| Total K through 5 enrollment | 1786 |
| Majority enrollment | 851 |
| Minority enrollment | 935 |
| Percentage of minority | 52% |
| Percentage of majority | 48% |

The racial/ethnic breakdown of enrollment from Kindergarten through Senior High School, as of October 1, 1974, was:

| | |
|---|---|
| Total enrollment | 4096 |
| Total minority enrollment | 2089 |
| Percentage of minority enrollment | 50.8% |

To sustain its contentions the District avers:

"By definitions of the Commissioner of Education and the Board of Regents, a school district which has more than 50% minority students is racially imbalanced. * * *

"The situation facing the Amityville Public Schools in 1974 is not whether or not an individual school is imbalanced, but whether the total district is imbalanced. * * *

"A comparison of the enrollments in 1965 with those in 1974 indicates that there has been relatively small increase in the number of minority children enrolled in the Amityville Schools over the past nine years. There has, however, been a rather significant decline in majority enrollment. The fact that 970 Amityville children now attend private and parochial schools indicates that some of this decrease is due to white flight. The percentage of non-public school attendance in Amityville has grown from 17% in 1965 to 24% in 1974. The percentage of non-public school attendance in Amityville is far greater than for Suffolk County as a whole.

"Every time an institution or agency places a minority child or minority children in the Amityville Schools, the district becomes more and more racially imbalanced with an increasingly larger majority of minority pupils. Unless agencies and institutions are prohibited from placing minority children in

Amityville Schools, the school district is in danger of being segregated into a definably black school district. * * *

"Eight additional black children in grades K through 5 in the Amityville Schools would be enough to tip the balance and provide for a majority of black children in those grades. Since the balance is so close and the school district relatively small, a few children can make a significant difference.

"As long as Amityville can maintain an integrated and racially balanced school system, the district believes that it will be able to attract as residents both black and white parents who are looking for an integrated education for their children. Once the district becomes racially imbalanced, white flight will be accelerated and the schools can rapidly become definably black and racially segregated.

"The Amityville School District has a public and a legal responsibility to do everything in its power to maintain itself as a racially balanced and desegregated school system which provides meaningful, integrated experiences for all of its children. The School District must resist all efforts and actions by agencies that tend to upset its racial balance and turn it into a segregated district."

### THE APPLICABLE STATUTES

Under section 371 of the Social Services Law, St. Christopher's Home is an "authorized agency" empowered and permitted to place out and board children (see n 2, *supra).* Section 371 also contains definitions of various authorized arrangements for the placing out or boarding of children.

Chapter 276 of the Laws of 1967 (eff Sept. 1, 1967) amended the Social Services Law (then the Social Welfare Law) in relation to authorizing and permitting the care of certain children in group homes. The amendment added the following definition to section 371: "17. 'Group home' shall mean a facility for the care and maintenance of not less than seven, nor more than twelve children, who are at least five years of age, operated by an authorized agency."

Chapter 276 also added section 374-c to the Social Services Law:

"§ 374-c. Authority to operate group homes. A public welfare official who is authorized to place children in family homes and institutions, pursuant to section three hundred ninety-eight, may be authorized by the board to operate group

homes in compliance with rules of the board, provided that such official demonstrates to the satisfaction of the board the need therefor and that suitable care is not otherwise available for children under the care of such official, through an authorized agency under the control of persons of the same religious faith as such children. Such homes shall be subject to supervision, visitation and inspection by the board."

In 1971, section 374-c was amended by the addition of the following sentence at the beginning of the section (L 1971, ch 677, eff June 22, 1971): "An authorized agency which is not a court, public board, commission or official is hereby empowered and permitted to operate group homes in compliance with rules of the board."

The legislative memorandum submitted by the Department of Social Services in support of this 1971 amendment reflected its view that group homes are desirable and urgently needed:

"This bill permits authorized agencies to operate 'group homes' by statute rather than requiring such agencies to secure such authorization by appropriate amendments to their certificates of incorporation with approval by the New York State Board of Social Welfare. * * *

"At the present time, many private authorized agencies, which are empowered to 'place out and board out children', cannot operate group homes without amending their charters and securing approval by the New York State Board of Social Welfare. This bill, by permitting, by statute, authorized agencies to operate group homes, would streamline the procedure for their establishment and thus benefit the welfare of large numbers of children. There is a great need for group homes because of the shortage of foster homes; this Department has determined that these group homes, providing care to not less than seven nor more than twelve children, are desirable for providing care in a residential setting closely identified with community living. Many private, non-profit agencies are presently operating such facilities; in addition, social services officials also have the authority to operate such group homes under certain conditions. The rules of the State Board of Social Welfare provide adequate safeguards for the operation of group homes; and accordingly authorizing their establishment by statute will not lower the quality of care which would be provided by such homes since they would in any case be required to operate in accordance with such rules." (NY Legis Ann, 1971, pp 298–299.)

In 1973 the Legislature recognized the need for not separating below-school-age children from siblings placed in a group home. Thus the definition in section 371 of "group home" was amended to except from the five-year-of-age minimum requirement, siblings placed in the same facility (L 1973, ch 315).

On February 27, 1973, the State Commissioner of Education upheld the Amityville School District's refusal to admit six nonwhite, handicapped children residing in a group home established in the Village of Massapequa by St. Mary's of the Angels Home (*Matter of Sister Mary Olivia, as Administrator of St. Mary's of Angels Home,* 12 Ed Dept Rep 213). The commissioner's decision was based on his interpretation of section 3202 of the Education Law, which then read, in pertinent part:

"§ 3202. Public schools free to resident pupils; tuition from nonresident pupils.

"1. A person over five and under twenty-one years of age is entitled to attend the public schools maintained in the district or city in which such person resides without the payment of tuition. * * *

"4. Children cared for in a duly incorporated orphan asylum or other institution for the care, custody and treatment of children, other than the children of the officers and employees of such institution, shall not, by reason of their presence in such institution, be deemed to be residents of the school district in which such institution is located. The trustees or other authorities in charge of any such institution may contract with the trustees or board of education of the school district in which such institution is located for the secular instruction of such children. If such children are supported and maintained at the expense of a public welfare district, the cost of the secular instruction of such children in the school or schools in the district shall be paid by the public welfare district which is liable for the payment of the cost of their support and maintenance. If such children are not supported and maintained at the expense of a public welfare district, the cost of the secular instruction of such children in the school or schools in the district shall be a charge upon and shall be paid by the school district responsible for their instruction at the time of their admittance to said duly incorporated orphan asylum or other institution for the care, custody and treatment of children. The trustees or board of education of the

school district in which such institution is located shall receive such children in the school or schools of the district for instruction for a compensation to be fixed by the trustees or board of education unless such trustees or board of education shall establish to the satisfaction of the commissioner of education that there are valid and sufficient reasons for refusal to receive such children.

"5. Children cared for in free family homes, and children cared for in family homes at board, when such family homes shall be the actual and only residence of such children or such children have been removed from the custody of their parents by order of the children's court, shall be deemed residents of the school district in which such family home is located. Other children cared for in family homes at board shall not be deemed residents of the school district in which such family homes are located, but shall receive free tuition in the school district in which such family homes are located, unless the trustees or board of education of such school district shall establish to the satisfaction of the commissioner of education that there is a valid and sufficient reason for refusal to receive such children or that the reception of such children in the school or schools imposes an unreasonable additional operating cost on such school district. In the latter case the commissioner of education may decide that tuition shall be paid for such children, in which case he shall fix the amount of tuition to be paid by the person responsible for the support of any such child or children. If any such child is a charge on any public welfare district, such tuition shall be paid by the public welfare district responsible for the child's support and maintenance."

In upholding the school district in the *St. Mary's* case, the commissioner held (p 214):

"The facility in which the students are housed is in the nature of an annex of St. Mary's of the Angels Home and may not properly be considered a 'family home'. As a result, the provisions of Education Law § 3202(5) are not applicable. Rather, subdivision 4 of that section is applicable in these circumstances. * * *

"I find that respondent's refusal to accept these pupils in its schools is justified for the reason that the schools of this district are overcrowded".

By chapter 867 of the Laws of 1973, the above-mentioned subdivision 5 of section 3202 of the Education Law was re-

pealed and the following was substituted in lieu thereof (the District notes the failure of the new subdivision 5 to make specific mention of "group homes"):

"5. a. The cost of instruction of pupils placed in family homes at board by a social services district or a state department or agency shall be borne by the school district in which each such pupil resided at the time the social services district or state department or agency assumed responsibility for the support and maintenance of such pupil; provided, however, that such cost of instruction shall continue to be borne during the remainder of the minority of any such pupil by any social services district or state department or agency which assumed responsibility for tuition costs for any such pupil prior to January one, nineteen hundred seventy-four. Where the cost of instruction is to be borne by a district other than the district furnishing instruction tuition shall be computed as provided in paragraph d of this subdivision.

"b. Children cared for in free family homes and children cared for in family homes at board, when such family homes shall be the actual and only residence of such children and when such children are not supported and maintained at the expense of a social services district or of a state department or agency, shall be deemed residents of the school district in which such family home is located.

"c. Children cared for in free family homes and children cared for in family homes at board, when such family homes are not the actual and only residences of such children and when such children are not supported and maintained at the expense of a social services district or of a state department or agency, and who apply for the first time for admittance to the schools of the district in which such family home is located during the school year 1973–1974 shall be admitted upon terms and conditions including the payment of tuition, established by the board of education of such school district, unless such board of education shall establish to the satisfaction of the commissioner that there are valid and sufficient reasons for refusal to receive such children.

"d. For the purposes of this subdivision, tuition shall be fixed in an amount which represents the additional operating cost to the school district resulting from the attendance of a child for whom tuition is required, computed in accordance

with a formula established by the commissioner of education."[3]

The District argues that the Legislature has made clear distinctions between the various alternative types of child care arrangements (see Social Services Law, § 371); that the new subdivision 5 of section 3202 of the Education Law was enacted in 1973 after the group home statutes had been enacted; that the Legislature could, had it so desired, have made specific reference to group homes in the new subdivision 5; that its failure to mention group homes manifests an intent that group homes not be covered by the new subdivision 5; and that Special Term, therefore, erred in concluding that group homes are embraced within the "family home" reference of paragraph a of subdivision 5. We disagree.

## THE LAW

### A

#### WHAT IS A GROUP HOME?

In *City of White Plains v Ferraioli* (34 NY2d 300) the Court of Appeals dealt with the question of the status of group homes, in a zoning context. In *Ferraioli,* the City of White Plains sought to enforce its zoning ordinance and enjoin use of a single-family house as a group home. The house was located in a single-family zone. The city contended that the group home was not a single-family use. In rejecting the city's contentions, the court held:

"It is concluded that the group home, set up in theory, size, appearance and structure to resemble a family unit, fits within the definition of family, for purposes of a zoning ordinance (p 303).

"The group home is a permanent arrangement and akin to a traditional family, which also may be sundered by death, divorce, or emancipation of the young. Neither the foster parents nor the children are to be shifted about; the intention is that they remain and develop ties in the community. The purpose is to emulate the traditional family and not to introduce a different 'life style' (p 305).

"Whether a family be organized along ties of blood or formal adoptions, or be a similarly structured group sponsored

---

3. In 1974 the above new subdivision 5 was amended with respect to its usage of the word "minority", a matter not material to this appeal (L 1974, ch 919, § 8).

by the State, as is the group home, should not be consequential in meeting the test of the zoning ordinance. So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance. * * * Moreover, in no sense is the group home an institutional arrangement, which would be another matter. Indeed, the purpose of the group home is to be quite the contrary of an institution and to be a home like other homes" (pp 305–306).

The concept of "family" is inherent in the concept of group homes. The great desirability and need for such homes has been clearly manifested by the legislative memorandum of the Department of Social Services *(supra)* and by *Ferraioli (supra)*. The legislative construction proposed by the District would result in an emasculation of the group home concept and cause disruption in the lives of the very persons whom the various placement provisions of the Social Services Law were designed to protect, viz., children. Therefore, with respect to the educational status of these group home children, they must be deemed residents of the District (Education Law, § 3202, subd 1) and we are in accord with the conclusions of Mr. Justice KELLY at Special Term that: "the education of children, such as the infant petitioners, is not, as concluded by the Commissioner in the *St. Mary's* case, *supra,* governed by subdivision 4 of Education Law § 3202 but, rather, by subdivision 5. a, since the group home in which they reside is a 'family home' in which they have been placed by a Social Services District. They are, therefore, entitled to be educated in the schools of the School District wherein the group home is located [here East Massapequa], the cost of their instruction to be computed and borne as prescribed in the Statute."

B

### THE RACIAL IMBALANCE THEORY OF EXCLUSION

The District also contends that the duty to act affirmatively to prevent segregation of its school system (see *Brown v Board of Educ.,* 347 US 483) calls for new action in view of the tipping phenomenon; that in refusing admission to the infant petitioners it is seeking to short-circuit white flight caused by the District's schools "apparently having exceeded their natural tipping point"; that both St. Christopher's home, "as an

agency performing a function of the state," and the District are both bound to further *long range* integration and neither is permitted to make decisions which "will have the long-range effect of promoting or making more probable a racially segregated school system". In support of these contentions, the District cites various studies recognizing the racial "tipping" phenomenon, and also cites *Otero v New York City Housing Auth.* (484 F2d 1122) which, in effect, held that where there is a duty to further the long-range process of integration, a limit may be placed upon the number of nonwhites accepted into a federally funded housing project.

In our opinion, these eight black children may not be excluded in the name of avoiding what the District Superintendent claims will be a "definably black" school system. We note initially that section 3201 of the Education Law provides: "§ 3201. Discrimination on account of race, creed, color or national origin prohibited. 1. No person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin." (Cf. *Board of Educ. v Swann,* 402 US 43.) Furthermore, admission of eight black children scattered over various grades could have but a minimal effect on the present racial balance. Far more important, however, is the fact that the District is not a governmental immigration agency and does not have authority (via school admission controls) to decide the numbers and races of families (with school age children) who may enter and reside in the District. A school district may and should ensure that its schools reflect the racial composition of the community, *but it has no right to decide what the racial composition of the community shall be.* The District's approach not only suffers from legal and moral deficiencies, but is based upon a logical *non sequitur.* For example, if black families with school age children moved into the community the District could not refuse to enroll them. Similarly, the District cannot control the emigration from the District of white families who (whatever their reason) choose to leave the community.

In short, the District's policy, in reality, is effective only against those most helpless and most in need of education, here eight black children. Under these circumstances, its refusal to enroll these petitioners as students was an act of blatant discrimination against children living in the district, which cannot be justified on the theory that by so doing it was

providing longer range benefits for the race so discriminated against. Although all sociological concepts are subject to ongoing re-evaluation and modification, it may well be that the group homes, operated in accordance with the statute and as described in *Ferraioli* (34 NY2d 300, 303, *supra)* ("in theory, size, appearance and structure to resemble a family unit"), are one means of ameliorating and repairing the familial disruption that is often an indirect by-product of the oppression heretofore suffered by the race to which these children belong. Thus; the existence and successful operation of the group home in which these children reside would appear in the interest of an even longer range objective than that under which the District would bar the children.

The judgment should be affirmed, with costs.

GULOTTA, P. J., RABIN, HOPKINS and MUNDER, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered December 3, 1974, affirmed, with costs.