The **PARENT ASSOCIATION OF ANDREW JACKSON SCHOOL, etc., et al., Plaintiffs,**

v.

**Gordon AMBACH, Commissioner of Education of the State of New York, et al., Defendants.**

**No. 76 C 1212.**

United States District Court, E. D. New York.

March 15, 1978.

As Amended June 16, 1978.

---

James I. Meyerson and Nathaniel R. Jones, New York City (N.A.A.C.P.), for plaintiffs.

Lawrence W. Reich, Albany, N. Y. (Robert D. Stone, Albany, N. Y., of counsel), for the Commissioner of Education.

Deborah Rothman, New York City, and Robert S. Zeif (Allen G. Schwartz, Corp. Counsel, New York City, of counsel), for the Board of Education of the City of New York.

MEMORANDUM INCORPORATING FINDINGS of FACT and ORDER

DOOLING, District Judge.

The Andrew Jackson High School is located in Queens about one mile from Nassau County. Preliminary attendance data for the current school year show that the school is utilized to the extent of 76% of its capacity and that at October 31, 1977, there were 2,532 children on the school's register. Of these, 2,454 are black, 2 are of American Indian, Asian, or Pacific Island origin, 75 are Puerto Rican or other Spanish surnamed children and 1 is classified as "other".

Andrew Jackson opened in 1937. In 1957, the first year in which ethnic data were reported, the register showed that 82% of the children were classified as "others", the term used for statistical purposes for children not identifiable as belonging to any "minority". The percentage of "others" registered for attendance at Andrew Jackson declined steadily from year to year until by 1974 2% of "others" were in attendance. The School Profiles report of 1974–1975 showed that there were 57 Jackson students classified as "others" at October 31, 1974, comprising 2% of those on the register, and the School Profiles for 1975–1976 reported 30 "other" children in attendance or 1%. At October 29, 1976, there were 4 "other" children at Jackson.

New York City is a single school district. For many statistical and administrative purposes, however, it is administered in five major divisions which correspond to the five boroughs. The School Profiles report for 1975–1976 reported that in that year at October 31, 1975, there were 260,012 academic high school students, 40.9% of whom were classified as "other", 35.6% of whom were classified as black, 16.6% were classified as Puerto Rican and 4.7% as other Spanish-surnamed, 2.2% as Oriental and ⅒th of 1% as American Indian. The data differ from borough to borough. In Manhattan, in 1975–1976, 42.1% of the academic high school students were black, 26% were Puerto Rican, 11.5% were other Spanish-surnamed, 12.8% were Oriental, ⅖ths of 1% were American Indian and 15.4% were classified "other". In the Bronx academic high schools, in 1975–1976, 39.7% were black, 34% Puerto Rican, 3.2% other Spanish-surnamed, 1% Oriental, ⅒th of 1% American Indian, and 22% were classified as "other". In the academic high schools in Brooklyn in 1975–1976, 40% of the students were black, 14.4% Puerto Rican, 2.2% other Spanish-surnamed, 2% Oriental, ⅒th of 1% American Indian, and 41.4% were classified "other". In the Queens academic high schools at the same date, October 31, 1975, it appeared that 30.4% of the students in the academic high schools were black, 6.1% were Puerto Rican, 5.8% other Spanish-surnamed, 2.1% Oriental, ⅒th of 1% American Indian, and 55.4% were classified as "other". In the Staten Island academic high schools in the same school year 7.4% of the children in register were black, 3.1% Puerto Rican, 1.1% Spanish-surnamed, ⅘th of 1% were Orientals, and 87.9% were classified as "other".

The 1975–1976 school year data as given in School Profiles, however, show that if the figures are analyzed on a year by year basis, then for all boroughs the percentage of blacks and Puerto Ricans is lowest in the 12th grade and is progressively higher in grades 11 and 10 and 9. The effect of this persistent factor is broadly reflected in all the data furnished; the data by boroughs, by individual schools, and for the district, reflect this trend element in the steadily rising percentage of minorities and declining percentage of "others". The preliminary data for the current school year, as at October 31, 1977, are illustrative. In the Manhattan academic high schools at October 31, 1977, 43% of the students were black (1975–1976, 42.1%) 40% were Puerto Rican and other Spanish-surnamed (1975–1976, 37.5%) 6% were American Indian, Asian, etc., (1975–1976, 5%), and 11% were "other" (1975–1976, 15.4%). In the Bronx academic high schools at the same date 40% of the students were black (1975–1976, 39.7%), 38% Puerto Rican and other Spanish-surnamed (1975–1976, 37.2%), 2% were American Indian, Asian, etc. (1975–1976, 1.1%), and 20% were "other" (1975–1976, 22%). In the Brooklyn academic high schools 44% were black (1975–1976, 40%), 19% Puerto Rican and other Spanish-surnamed (1975–1976, 16.4%), 2% were American Indian, Asian, etc. (1975–1976, 2.1%), and 35% were "other" (1975–1976, 41.4%). In the Queens academic high schools, 33.4% were black (1975–1976, 30.4%), 14.8% were Puerto Rican and other Spanish-surnamed (1975–1976, 11.9%), 3.2% were American Indian, Asian, etc. (1975–1976, 2.2%), and 48.6% were "other" (1975–1976, 55.4%). In the Staten Island academic high schools at the same date 9% were black (1975–1976, 7.4%), 5% Puerto Rican and other Spanish-surnamed (1975–1976, 4.2%), 1% American Indian, Asian, etc. (1975–1976, 0.4%), and 85% were "others" (1975–1976, 87.9%).

In 1957 when the enrollment of "others" at Andrew Jackson High School was 82% of the registration, the percent of "others" in the Queens academic high schools taken in total was 94.2%. At that time the total enrollment in the Queens academic high schools was 48,930 children. The highest the enrollment has been since that date was 72,131 in 1975. In the period from 1957 through 1977 the percentage of "others" in the Queens academic high schools has uninterruptedly declined from 94.2% to 48.6% in the current school year (according to the preliminary figures as at October 31, 1977). Over the years 1957 through 1976, the whole period for which the Board of Educa-

tion has been keeping ethnic data on school registrations, the Queens elementary schools have shown a decline from 85.9% "other" in 1957 to 47.5% in 1976. As in the case of the academic high schools, the decline in percent "other" is uninterrupted. The peak elementary school population came in 1965 when there was a total enrollment of 131,608. The enrollment in 1976 was 118,266.

Analyzing the data on the enrollment in all public schools in Queens from kindergarten to grade 12 throws an additional light on what may be expected in the near future. In the school year 1976–1977 the children entering school for the first time in the first year were 43.8% "other". The children in the graduating class of high school at the same date were 60.6% "other". In each year from the entering class of six year olds to the graduating class in high school the percent of "others" in attendance at October 29, 1976, was a little higher, again indicating the same uninterrupted decline in "other" percentage in school attendance. The only aberration is in the seventh year which is shown as having 47.3% "other", which is more than either the eighth or ninth years at the date in question.

Projection of the trends exhibited by the data through 1976 to the school year 1981–1982, it is indicated, forecasts a 36.4% "oth-er" school population in the Queens academic high schools in that year, and will show a 28.3% "other" school population in the Brooklyn academic high schools in the same school year.

Comparison of the ratio of Queens births of "others" to total Queens births in the years 1965 through 1970 with the ratio of "others" entering the Queens public schools 6 years later, when the children would have reached school entry age, shows that the school entrants' ratio of "others" to total school entrants is radically lower. Thus 81% of the Queens births in 1965 were "others"; in 1971 only 54% of the school entrants were "others." In 1970 the "others" births were 75% of the total; in 1976 the school entrants who were "others" were only 44% of the total. Projecting the trend of these figures to school entrants of 1981 indicates that, although 65% of the 1975 Queens births were "others," only 35% "others" are expected to enter the Queens public schools in 1981.

The current registers of the Queens academic high schools, the number of "others" on register at each school and the percent of the school's population that the "others" represented are as set forth in the following Table I (the schools are arranged in the order of the percent "others" in the schools):

TABLE I
Queens Academic High Schools
At October 31, 1977
(Unaudited)

| School | On Register 10/31/77 | Number of "Others" | Percent "Other" | Percent Utilization |
|---|---|---|---|---|
| Grover Cleveland | 4571 | 3141 | 69 | 152 |
| L. I. City | 3040 | 1913 | 63 | 131 |
| John Adams | 5096 | 3107 | 61 | 124 |
| Bayside | 3878 | 2337 | 60 | 116 |
| Richmond Hill | 2841 | 1706 | 60 | 99 |
| Beach Channel | 3581 | 2139 | 60 | 89 |
| Martin van Buren | 3706 | 2205 | 59 | 109 |
| Francis Lewis | 3031 | 1794 | 59 | 105 |
| Forest Hills | 2608 | 1469 | 56 | 90 |
| Benjamin Cardozo | 3261 | 1740 | 53 | 91 |
| Wm. C. Bryant | 4049 | 2022 | 50 | 111 |
| Flushing | 2863 | 1316 | 46 | 99 |
| Hillcrest | 3098 | 1368 | 44 | 89 |
| Far Rockaway | 2733 | 987 | 44 | 75 |

| School | On Register 10/31/77 | Number of "Others" | Percent "Other" | Percent Utilization |
|---|---|---|---|---|
| John Bowne | 3979 | 1718 | 43 | 117 |
| Jamaica | 3285 | 1366 | 42 | 105 |
| Newtown | 4862 | 1585 | 33 | 109 |
| Springfield Gardens | 3300 | 923 | 28 | 97 |
| August Martin | 1806 | 24 | 1 | 75 |
| Andrew Jackson | 2532 | 1 | – | 76 |
| | 67620 | 32861 | | |

Andrew Jackson has been a single session school for some years, as were, in 1976, August Martin, Beach Channel, Far Rockaway, Francis Lewis, Hillcrest, and Newtown Annex. Nine of the other academic high schools operated two class sessions, and three—Forest Hills, Grover Cleveland, and Long Island City—operated three class sessions.

---

It is evident from the Table I figures that over 55% of the children classified as "other" attend schools in which the percent of "other" students is 59% or more. Seventy-five percent of the "other" children attend schools in which the percentage of "other" is over 45%, and 92% of the "other" children attend schools in which the percentage of "others" exceeds 40%.

In the academic high schools in Queens at October 31, 1977, there were 22,557 black children on register constituting 33.4% of the Queens academic high school population. Of these children over 27% attended schools in which the register of black children was 67% or more. Black children were 97% of the children on register at Andrew Jackson, 87% of the children on register at August Martin and 67% of the children registered in Springfield Gardens High School. About 37.5% of the black children on register in Queens attend schools in which the register showed more than 40% black children and 43% of the black children attended schools in which the register was more than 35% black. Overall 68% of the black children were in schools in which the black register was 30% or more.

The Andrew Jackson High School and the area surrounding it form only one part of an extremely large school district. The immense increase in the black and Spanish-surnamed population of the City as a percentage of its total population has interacted with an inexorable pattern of residential segregation dramatized by the concentration of poor minorities in the older parts of the City where age-worn housing and low-income public housing provide apparently increasingly segregated neighborhoods. During this same period the exodus of principally white middle income families with school-age children to the suburbs had independently influenced the ethnic composition of the academic high school population. And, over this same period the City has lost jobs, and, in consequence job opportunities on a very large scale as businesses have left the City, sometimes for the suburbs to which their middle-income "white collar" workers have preceded them. Queens is both an integral part of the city, sharing its aging and alteration, and in some sort, and in its more recently built-up areas, an inner suburb of the central city.

So much is common observation. Education in this vast school district can anticipate that the school population in the near future will decline, or, at least, not increase, and there are statistical intimations that net job loss may end if it has not turned toward net job gain. The trend to suburbanization may be in decline. But an overall expectation that the City school district will find its problems of segregation solved by time and migration of population does not exist. The City school district is consciously and properly oriented to dealing with segregation in the schools for the foreseeable future, and in face of a daunting array of apparently irreconcilable forces.

The case of Andrew Jackson is not the paradigmatic case of the school district at

the center of an aging metropolis that absorbs the total syndrome of a deteriorating housing stock that operates as the magnet of poverty, public assistance dependence and low-income public housing, and, so often, is recorded as having an above average incidence of crime and is seen as the area in which poverty may well produce the expectation of defeat and more poverty. *Cf.* Grier, *The . Negro Ghettos and Federal Housing Policy*, 1967, 32 Law & Contemp. Prob. 550, 553, 559. Contrast Olken, *Economic Development in the Model Cities Program*, 1971, 36 Law & Contemp. Prob. 205, 215–216. The area around Andrew Jackson is at the edge of the city, an area basically of detached and semi-detached houses, tree-lined streets, and of one and two family houses. The row house, the apartment house are not absent but are not prevalent. In short, it is physically an area to which families move, not an inner-city "ghetto" of worn and unattractive walk-up multiple dwellings.

Analysis of the birth records, reported for Health Districts of the New York City Department of Health in the region of Queens around Andrew Jackson at five year intervals from 1960 through 1975 shows the extent and the concentration of minority births in the area and the increased ratio of minority births over the years covered. The Health Districts covered are roughly those located in the areas from just west of Van Wyck Expressway to the Nassau border and from the southern extremity of the borough to approximately the area of Flushing cemetery and Northern Boulevard in the north. Table II shows the extent of minority births in the Health Districts nearest to Andrew Jackson High School. The school building is located in the southeastern corner of Health District 35.20; just to the east lies Health District 29.20, to the southeast Health District 35.31, and proceeding clockwise around the Andrew Jackson school building as a center are Health Districts 35.32, 35.10 and 28.20. Farther to the west beyond Health Districts 35.10 and 35.32 is Health District 34. North of Andrew Jackson is, finally, Health District 29.-10.

TABLE II

| Health District | % of Non-White Births, Certain Queens Health Districts | | | |
|---|---|---|---|---|
| | 1960 | 1965 | 1970 | 1975 |
| 35.20 | 47 | 88 | 94 | 98 |
| 29.20 | 7 | 12 | 60 | 85 |
| 35.31 | 3 | 23 | 63 | 85 |
| 35.32 | 76 | 70 | 92 | 96 |
| 35.10 | 83 | 91 | 92 | 95 |
| 28.20 | 2 | 6 | 28 | 39 |
| 34. | 93 | 93 | 97 | 99 |
| 29.10 | 1 | 1 | 9 | 14 |

Exhibits E–4 through E–7 are maps showing the health districts and the locations of the high schools in and near the health districts for which the data are given. On these maps the health districts are colored to indicate the differing ratios of minority to total births. Birth data are taken fairly to reflect the ethnic characteristics of the Health Districts and to be predictive of the ethnic composition of the school population in the region. The data showed good agreement with the 1970 census tract data.

New York City (like the four other large cities in the state) has a far larger percentage of black and other minority public school students than the parts of the state outside the "Big Five" cities. The statewide data for all public school students (pre-kindergarten through high school) for the school year 1975–1976 were:

| | Black | Spanish Surnamed | Other |
|---|---|---|---|
| Buffalo | 43.6% | 3.4% | 53.0% |
| New York | 37.1 | 28.4 | 34.5 |
| Rochester | 42.3 | 7.9 | 49.8 |
| Syracuse | 29.5 | 1.2 | 69.3 |
| Yonkers | 17.4 | 10.2 | 72.4 |
| Total "Big Five" Cities | 37.0 | 25.6 | 37.4 |
| Rest of State | 5.0 | 1.4 | 93.6 |
| Total State | 16.8 | 10.4 | 72.8 |

In the school year 1975-1976 there were 571,146 black students in the public schools of the state and 408,198 of them, or 71% were in the New York City schools. Of the 351,889 Spanish-surnamed children in the public schools of the state 312,512, or 88%, were in the New York City schools.

The non-public high schools in Queens in the same school year reported to the State Department of Education the enrollment of 17,849 high school students. The Department's report does not give any ethnic breakdown, but a report of the Diocese of Brooklyn, giving the ethnic breakdown for

the preceding school year, indicate that 89% of the students in the Queens Catholic high schools were "others".

Sewanhaka Central High School District No. 1 and Valley Stream Central High School District No. 1. in Nassau County are contiguous with Queens near the Andrew Jackson High School. None of the high schools in the Valley Stream C.H.S.D. has less than 96.2% "other" students and none of the Sewanhaka C.H.S.D. high schools has less than 92.6% "other" students. The eight senior high schools in these districts enrolled 13,977 students in the school year 1976-1977. Two of the Sewanhaka high schools were not used to capacity and three were used in excess of rated capacity.

The contrast in the ethnic components of the school populations in a technically urban region and in a contiguous region that is technically suburban reflects a long noted phenomenon, the low ratio of minorities in suburban communities and the high ratio of minorities in the cities that the suburbs enclose. A fairly recent survey of the demographic literature concludes that differences in income do not explain the fact: the suburbs do not remotely have the ratio of ·black families that an even distribution of all families by income class would place in the suburbs, and, where income classes are mixed, the phenomenon of separation along ethnic lines persists. See *Farley, Residential Segregation and its Implications for School Integration*, 39 Law & Contemp. Prob. 164, 165–167, 174–177.

Both the Board of Education of the City School District and its Chancellors, and the State Board of Regents and the State Commissioners of Education, have dealt directly with the question of the racial imbalance in the schools of New York City School District. Boards of Education in New York had, in the earlier part of the 19th Century, been authorized but not required to establish separate public schools for "colored" children, some school boards had done so, and their action had been held valid. *People ex rel. King v. Gallagher*, 1883, 93 N.Y. 438 (Brooklyn school); *People ex rel. Cisco v. School Board of the Borough of Queens*, 1899, 161 N.Y. 598, 56 N.E. 81 (Queens schools). After 1954, the New York courts, recognizing the invalidity of *de jure* segregation, recognized as well the power of the school boards to correct racial imbalance; the courts did not, however, hold that there was either a constitutional or a statutory duty to take steps affirmatively to relieve against racial imbalance. *Matter of Balaban v. Lubin*, 1964, 14 N.Y.2d 193, 250 N.Y. S.2d 281, 199 N.E.2d 375. School Board action that required bus transportation to redress imbalance was sustained. *Matter of Van Blerkom v. Donovan*, 1965, 15 N.Y.2d 399, 259 N.Y.S.2d 825, 207 N.E.2d 503. Indeed, the courts have upheld the action of the Chancellor of the City School District in overruling a Community School Board's plan of pupil assignment upon the ground that the plan would contribute to making a particular junior high school a segregated school. *Kryger v. Board of Education*, 2d Dept. 1971, 37 A.D.2d 622, 323 N.Y.S.2d 777. And at least one court has apparently rejected the contention that pupil assignments may be rejected because a school has apparently exceeded its "tipping point," the court indicating ·that the appropriate test is whether the schools of a district "reflect the racial composition of the community". *McMahon v. Amityville Union Free School District*, 2d Dept. 1975, 48 A.D.2d 106, 368 N.Y.S.2d 534.

The policy statements of the Regents[1] and the action of the Commissioner and the

1. Policy and related statements of the Regents 1960–1975 are collected in Exhibit 56. That of November 1967 emphasized the growth of urban racial isolation, the necessity that urban poor not be educated in isolation but be educated in schools with predominantly middle class populations and the need to improve the quality of the urban schools in order to encourage middle class families to remain in the cities. It outlined guidelines for action programs and proposed to the legislature Quality Incentive Grants for Urban Education. The Policy Statement of 1968 recognized the "extent of *de facto* segregation" in the State's schools, and that the elimination of racial prejudice, discrimination, and injustice was "the great moral and social imperative of our time." It was noted that racial imbalance within school districts

Board of Education reflect steady use of statutory power to redress racial imbalance. See, *e.g., Matter of Mitchell*, 1963, 3 Educ. Dept.Rep. 26 (Malverne); *Matter of Fishburne*, 1972, 12 Educ.Dept.Rep. 5. *Cf. Matter of Gray*, 1967, 6 Educ.Dept.Rep. 92, 143. The Regents' expression of state educational policy, in the form it took in February 1975, emphasized that "equal opportunity for high quality education is the right of every pupil in the public schools of this State, regardless of race, creed or color." Every school district was expected by the Regents "to take the steps necessary to enable every pupil to enjoy that primary right." The Regents stated:

"The Regents believe that integrated schools are essential to assure that primary right to all pupils residing in racially diverse communities. We define an integrated school as one in which the racial composition of the student body reflects the pupil population of the school district without necessarily attempting to be proportionate to it, and in which the programs, facilities, and equipment are not racially identifiable. What constitutes a reflection of the population of a school district will depend upon the circumstances in specific situations."

The Regents outlined as means of achieving high quality integrated education for all pupils the strategic location of new schools or closing unneeded schools or both, optional transfer and open enrollment programs, expansion of magnet and specialized schools, compensatory education programs, curricula that enhance interracial understanding, faculty recruitment from varied racial and ethnic backgrounds, equalization of state aid to school districts, alteration of school attendance zones where necessary, and in some instances, the judicious and reasonable transportation of pupils with due consideration that the health, safety and access to high quality education of pupils are not imperilled and that children of elementary school age are not transported for more than moderate distances.

The first out-of-the-ordinary action taken in reaction to the increasing ratio of minority enrollment in Andrew Jackson was the granting in 1963 to students in J.H.S. 192, a school in the Jackson "feeder" pattern, of the option to attend one of five Queens high schools other than Jackson. J.H.S. 192 was then 71% minority in enrollment. The option, available to 350 graduates, was exercised by 175 students. The expedient was meant both to reduce the minority ratio and to relieve overcrowding. The minority percentage was held to 39½% by this means.

A permissive transfer plan, introduced in 1964, gave 100 graduates of J.H.S. 59 and J.H.S. 231, who would have been zoned to Jackson but for the plan, the option of attending Francis Lewis High School. However, in the same period white registration was reduced by 414, and, instead of the anticipated reduction of minority attend-

was increasing in suburban and urban communities and that racial isolation among school districts was increasing. The Regents stated that "Educational considerations are primary in eliminating school segregation". The need for quality in the schools and its link to elimination of racial imbalance was reiterated. Noting the value of the "neighborhood" school in early education, the Regents stated that "when it becomes improperly exclusive in fact or in spirit, when it is viewed as being a reserve created for community groups, or when its effect is to create or continue a ghetto-type situation, it does not serve the purpose of democratic education, and corrective action is called for." The Regents recommended, *inter alia*, the exploration by school boards of the possibility of improving racial balance through cooperative action with neighboring districts, and the establishment and modification of school district boundaries so as to eliminate and avoid those which result in racial segregation. The policy statement of 1969 issued under the shadow of Chapter 342, Laws of 1969 (forbidding altering school boundaries and attendance zones in order to eliminate racial segregation) but, over the dissent of one Regent, who supported the principle of Chapter 342, reiterated the earlier policy statements. The policy statement of 1972 continued the policy position, with a recorded dissent from the failure to provide for limitations on compulsory busing to achieve integration. The 1974 policy statement repeated the central parts of the 1968 statement and that of 1972 and introduced qualifications related to the children's rights to health, safety and access to quality education. The February 1975 statement in the main reconciled the differences in view among the Regents.

ance to 35%, it rose to 43% of a smaller total student body.

A new high school, Springfield Gardens opened south of Andrew Jackson in 1965, and at the same time zoning and assignment changes were made in the expectation that Jackson would lose 1262 students of whom 65% were expected to be minority students. The changes, and their expected effect were these:

|  | Other | Minority |
|---|---|---|
| Zoned to Francis Lewis | 38 | 435 |
| Zoned to Springfield Gardens | 580 | 381 |
|  | 618 | 816 |
| To be received from Jamaica | 103 | |
| Addt'l from Jamaica | 69 | |
|  | 172 | |
| Net loss | 446 | 816 |

The expectation was disappointed. Enrollment for the school year 1965–1966 was 48.4% minority, 51.6% other. Andrew Jackson lost 391 whites from all grades from 1964 to 1965; Springfield Gardens opened with a 64.6% "other" student body, as compared with 81.6% "other" then registered in all Queens Academic High Schools.

The opening of Springfield Gardens High School marked the last act in a struggle over the siting of a school that would relieve overcrowding in the east Queens academic high schools. Two schools were planned, one became Springfield Gardens and the other, Benjamin Cardozo. Selection of the site rested not with the Board of Education but with the Site Selection Board established under the City Charter. However, the Board was an important and informed participant in the site selection process and its concurrence was required. Two sites were under review: the site finally· chosen, and the "Hollis Triangle" site. The later site, a ten acre irregular plot northwest of Jackson and north of the Long Island Railroad line at ,199th Street was visualized as so centrally located in relation to Jamaica, van Buren and Jackson High Schools that it would ideally relieve overcrowding in those schools. The Springfield Gardens site, a fifteen acre plot, it was argued by those interested in Jackson, would draw from Jackson a good part of its "other" constituency without adequately compensating by drawing minority students from its zone. Selection of the Hollis Triangle was urged by certain of the local civic groups and was favored by the acting associate· superintendent in the high school division, apparently on the assumption that no second new school would be built. Unquestionably ethnic balance considerations were in the debate over the selection and appeared clearly to weigh on the side of choosing the Hollis Triangle site. The final decision in favor of the present Springfield Gardens site was balanced with the expectation that a second school would be built in the northeast area, as Benjamin Cardozo later was. Those who had favored the Hollis Triangle site were convinced that a new school at the Springfield Gardens site would worsen the chance of maintaining or improving the ethnic balance at Jackson. The site was selected, finally, only after hearings at which strong support for location of the school at the Springfield Gardens site was expressed. The distribution of the existing high schools might be thought to have dictated the location particularly since much of the three southeastern communities, Springfield Gardens, Laurelton and Rosedale, was relatively new and growing in population. The Hollis Triangle was near the railroad right of way, historically susceptible to swift decay, and was in what real estate men characterize as a "soft neighborhood". The Health District birth data (Exhibits AA, maps E–4 to E–7) support the conclusion that at the time of decision experience counseled that the relative effect on the imbalance in Jackson of the two locations was a matter of speculation and not of assurance.

The siting of the high school at Springfield Gardens was based on considerations of cost, physical superiority of the site, and area need. The possible if not probable effect of the siting on the integration of Jackson was brought to the attention of the Superintendent and it was considered, as was the expectation that another high school would be established in the northeast, and that Springfield Gardens and the rezoning that it would precipitate could be

expected to affect the integration of Jackson favorably. The siting of Springfield Gardens was not intended to draw non-minority students from Jackson, or to make Jackson the St. Albans and Cambria heights school primarily and isolate it from the neighborhoods with high ratios of non-minority students.

In 1966 an open admissions program offered to students in three areas in the Jackson zone assignment to one of eight other high schools; the feeder schools affected were J.H.S. 8, J.H.S. 59, and J.H.S. 142; the students were allowed to list four of the schools in order of their preference. Children in the part of the open admissions area that was within one half mile of Jackson were allowed to list Jackson as a choice. The Francis Lewis "enclave" was continued, and 59 additional pupils were assigned to Francis Lewis.

The opening of Benjamin Cardozo High School in September 1967 occasioned substantial rezoning of the Queens high schools, including Andrew Jackson. Zoning children from north of the line of the Long Island railroad had earlier involved transportation problems that were ameliorated when the Q–77 bus route was established. By December 1966 a complex rezoning scheme had been devised, and it was thought within the Board administration that it would substantially alleviate, even reverse, the imbalance at Jackson in the 1967–1968 school year and the following years. Before the plan could be executed an appeal to the State Commissioner of Education for an order to compel the Board to rezone the Queens attendance zones to relieve the racial imbalance at Jackson resulted in an order of February 9, 1967 (*Matter of Gray*, 1967, 6 Educ.Dept.Rep. 92) directing the Board to submit by May 1, 1967, a plan "for substantially reducing the degree of racial imbalance at . . . Jackson . . . to become effective with the opening of school in September, 1967." Commissioner Allen said:

"There is some indication in the record that measures already taken by the respondents may have decreased the amount of increase in Negro pupils at Andrew Jackson High School. A serious situation of racial imbalance certainly must be deemed to exist, however, where a school has a percentage of Negro pupils three times that of the average for the county and where this condition has been allowed to become aggravated over a period of 6 years without adequate counter measures being taken."

The Superintendent of Schools of the Board sent a report to the Commissioner which included a revised attendance scheme for Jackson and informed the Commissioner that the Board had retained Nelson Associates to make a study and recommendations for rezoning the Queens schools. The scheme proposed for September 1967 did not differ greatly from the plan developed in the previous December: portions of the Martin van Buren and Jamaica High School zones were transferred to the Jackson zone and a Cardozo enclave was established in a part of the Jackson zone that contained a very high ratio of minority students; it was anticipated that 150 students (52 of them mandated) would enroll at Cardozo and that 205 students from the predominately "other" van Buren and Jamaica segments would be enrolled at Jackson. Commissioner Allen, by order of May 22, 1967, accepted the "preliminary report" as a "first step toward an ultimate solution for the most complex problems here involved." He said (*Matter of Gray*, 1967, 6 Educ.Dept.Rep. 143 at 144)

"The report indicates that respondent board of education is continuing its planning in the direction of major rezoning of all high schools in the Borough of Queens. In this connection said respondent has retained the services of a firm of consultants for the purpose of further studying ways to effect such a solution. The report of this consultant firm will be due later this summer.

"It is expected that after the receipt of said report, the respondent board of education will make a further report to me as to its immediate and long-range plans in the matter."

The Commissioner's order retained jurisdiction of the matter. (To anticipate, there were no further proceedings in *Matter of Gray* as such, and a November 27, 1967, order in effect permitted pretermission of the plan, 7 Educ.Dept.Rep. 90–91.) The plan had included the establishment of an expanded Music and Art program at Jackson in the hope that it would attract a higher percentage of "others". Had the plan succeeded in its entirety, Jackson would have been 50% "other".

The plan was frustrated. A three week teachers' strike and stays granted in proceedings to enjoin the plan instituted by parents of children who were to be zoned into Jackson put a stop to its effectuation.

The Nelson Associates report (Exhibit 32) recommended alternatives for implementation in September 1968. It is impressively thorough and workmanlike. The plan alternatives were (1) a school neighborhood plan, with extensive enclaving, (2) a plan under which Jackson would have become a mathematics and science special school (generally comparable to the established special schools, Brooklyn Techn, Bronx High School of Science, Music and Arts, and Stuyvesant), (3) a "linear" zoning plan, without enclaves, (4) another type conversion of Jackson to a special school, accompanied by uniting Jamaica and Thomas A. Edison Vocational High School to form a comprehensive high school, and (5) an outline plan to have all the Queens high schools unzoned.

The special school alternatives were quickly eliminated from consideration, although it was the preferred alternative of Nelson Associates. The high school division at the time was moving away from specialized high schools, which, on the whole tend not to reflect the City's or borough's ethnic composition. The unzoned alternative, although it had been used in some form in Baltimore, was not considered feasible for a sub-district as large as Queens, and it appeared to involve great expense, and posed transportation problems of unexplored extent.

The linear rezoning plan envisaged elongated school zones each of which would link more heavily white with more heavily black neighborhoods in one student body. Without enclaves, each school zone would be a cross sectional neighborhood; distances of travel might be great, but not conspicuously greater than a school neighborhood plan with enclaves; the zones would cross the east-west line drawn by Hillside Avenue-Long Island Railroad that, to many, separated the northern part of East Queens with its predominantly white neighborhoods from the southern part with its markedly higher incidence of minority neighborhoods. The plan was sensed as radical, and on the map it looks startling, but Nelson Associates considered that the plan would not in fact involve moving white children into any school that was theretofore identifiably a minority school, except that Rosedale children would be assigned to Jackson.

The school neighborhood plan was a bolder version of the kind of zoning techniques which the Board itself had already used. The zone of Jackson was extended northward, considerably beyond the northerly line proposed in 1967, beyond the Long Island Railroad and Grand Central Parkway to 73rd Avenue. Enclaves were established, and students in the enclaves were mandatorily assigned to schools with higher "others" ratios than Andrew Jackson's (Bowne, Forest Hills, Richmond Hill, van Buren, and Cardozo).

The Board's choice of the "school neighborhood" over the "linear zone" plan took into account the expressions of community preference, some of which reflected determined resistance to zone revisions that would increase the ratio of minority students in the more northerly schools—for example van Buren—or would result in childrens' attending schools that were not those nearest their homes and in which there would be a higher ratio of minority students than there would have been but for the zone revision. The evidence does not support a conclusion that the expressions of community preference were more than one of many factors bearing on the decision, nor support a conclusion that the

Board or its representatives were sympathetic with the views expressed. The purpose of the Board was and continued to be pursuit of the school neighborhood plan as a means of advancing integration in the Queens high schools, and the inference from the testimony is that it was recognized that avoidance of community resistance was a factor in making any rezoning plan succeed. On the projections of the Nelson report the school neighborhood plan was expected in 1970 (when its changes would have full effect) to show a better desegregation rating than would the linear zone plan. The Nelson report itself expressed a reasoned preference for the school neighborhood plan over the linear zone plan.

The school neighborhood plan, adopted for September 1968 with some modifications (enclaves for Bayside, a modification of the border between Flushing and Bayside High Schools, and transferring an enclave from Flushing to Bayside High School), was expected to make Jackson 60% "other" and 40% minority. In 1968 the teachers, for the second year, struck the schools, a bitter strike that, in some areas (*e.g.*, Brownsville-Ocean Hill) erupted in confusing racial controversy; the strike lasted until late November 1968. When the schools opened effectively the several hundred "other" students expected at Jackson from the new parts of the school zone north of the railroad (*e.g.*, from Jamaica Estates and Queens Village) did not appear; only a few registered and attended. What had happened is not demonstrable. No doubt some children went to other Queens high schools using addresses of convenience (by no means an unprecedented expedient, apparently); some may have enrolled in private schools; some obtained variances of assignment in the spring, and went to other schools for one or another of the array of reasons that, when truthfully put forward, justify variances. Some certainly exercised proper choices of special schools, vocational high schools, or unzoned high schools; and some were transferred out after they were listed to Jackson. None of the explanations for the nonappearance of the expected "others" is satisfactory. The variance records had been destroyed in the ordinary course of record retention procedures, but it is not clear that the variance records would have mattered if the attendance estimates were made up from the List Reports, which exclude the students granted variances. The transfer data are inconclusive because not measured against the experience of other high schools of the same size, but they do show transfers out of Jackson to other public schools and to non-public schools, and transfers made because the student moved out of the City. The transfers, however, do not nearly account for the shortfall in expected "other" students in the fall of 1968. Simply, the expectation of the school neighborhood plan was disappointed. The evidence does not support the conclusion that maladministration of the variance and transfer controls was responsible for the failure of the expected students to appear,[2] nor was any yielding to the sit-in at Jamaica High School responsible for the loss of the students expected from what had been the Jamaica segment of the revised Jackson zone. In the end Jackson, instead of becoming 60% "other" and 40% minority became 46% "other" and 54% minority. The Music and Art program did operate to an

2. Exhibits 234 and 235 set out the transfer data. They do not show an extraordinary number of transfers in 1968. The most numerous transfers and other school-leavings are for over-age, moved out of city, moved out of state, moved to Long Island. The most numerous transfers to other academic high schools were to van Buren. There were 67 in 1967 (related to the litigation, see Exhibit AF) and 15 in 1968. The next most numerous transfers were to Jamaica. There were 27 in 1967 (18 due to litigation, see Exhibit AE) and 37 in 1968. Exhibits AE, AF, AH, AI, and AJ give somewhat different transfer data, but do not support a conclusion that transfers explain the failure of the expected "others" to enroll in Jackson. Exhibits AH and AI show during 1968 215 pupils left the city, and 78 left the new zone for other Queens academic high schools. Their race is not shown. Exhibit AJ shows 50 transfers in 1968 to non-public schools. Exhibit AL gives data on eight non-public schools in the vicinity of Jackson; they had 4300 to 4800 students in 1966–1969 and showed a smaller year to year increase in 1967–1968 than in the other years.

extent as a magnet: the percentages enrolled in 1967 and 1968 were—

|  | 1967 | 1968 |
|---|---|---|
| Music | | |
|   "Other" | 55% | 49% |
|   Minority | 45 | 51 |
| Art | | |
|   "Other" | 59 | 55 |
|   Minority | 41 | 45 |

From 1963 to 1968 the percent of "others" at Jackson decreased 14.3%; for all Queens academic high schools it decreased 16.0%.

The Nelson school neighborhood plan was intended to function over a period of time and it was continued in the next two school years, commencing in September 1969 and September 1970 without substantial change. The drop in "other" enrollment at Jackson accelerated rather than slowed. In 1969 the "others" were 38% and in 1970 29% of the school population. Attrition of "others" in Jackson from year to year was a contributing factor, e.g., an 11th year class with 342 "others" in 1968 produced a 12th year class with 221 "others". It was thought that enclave zoning was effective in placing minority students from the Jackson attendance area in the eight receiving schools all of which showed percentages of minorities in the school population much in excess of the percentage of minorities reported in the census data for the census tracts in the attendance areas of the eight schools. Exhibit J–2 shows the enclaves west of the enlarged Jackson zone and the size of its northerly extension.

Hillcrest Comprehensive High School opened for the school year commencing in September 1971. The school was very near Jamaica High School. The zone carved out for Hillcrest was made up from the westerly part of the Jamaica zone and from the Forest Hills zone. The Jamaica zone was extended east to include the northwesterly part of the revised Jackson zone of 1968, the part, that is, north of Grand Central Parkway and west of 188th Street. (It was the Board's judgment that few "others" from that area attended Jackson.) The

John Bowne enclave was reduced, the Forest Hills enclave eliminated, the Francis Lewis enclave altered in boundaries and Richmond Hill and Flushing enclaves were established. The projections made in March 1971 for the new zoning showed that it was anticipated that Jackson's utilization would be 100% and that the school would be 29.3% "other" and 70.7% minority in September 1972, and would in September 1972 be 77.8% minority and 22.2% "other". In the event the experience was the following:

|  | 1971 | 1972 |
|---|---|---|
| "Other" | 17.6% | 11.5% |
| "Minority" | 82.4% | 88.5 |

Hillcrest, projected to open with 61.8% "other" in 1971 and to be 65.9% "other" in 1972, in fact opened with 59.4% "other", and in 1972 was 51.5% "other".

No zoning changes were made in 1972; the Board's records noted persistence in the "pattern of internal attrition" of "other" students between the 11th and 12th year at Jackson; the pattern continued in the next two years, to the following extent:

| | Numbers of "Others" in 11th and 12th year classes | |
|---|---|---|
| | 11th | 12th |
| 1971 | 209 | |
| 1972 | 101 | 156 |
| 1973 | 36 | 43 |
| 1974 | | 19 |

In 1973 Beach Channel High School (located on the Rockaway peninsula) opened and a "Choice of Admissions" zone was established by making students in the pre-existing enclaves eligible to be assigned to any of eight designated receiving schools on the basis of pupil preference subject to the availability of space. A study of the operation of the Choice of Admission scheme, made early in October 1973, indicated that 1836 students were assigned to eight high schools (other than Jackson) for the year 1973–1974, about 200 more than the number assigned in the previous year from the enclaves. It was considered that the change in method affected the ethnicity ratios (as against the enclave zoning) minimally in four of the high schools and measurably in two of the high schools, Forest Hills and Newtown, each of which was reckoned to

evince a decrease in "others" percentage (2.6% for Forest Hills, 3.8% for Newtown). The "Choice of Admissions" area was, as were the enclaves, located in the heavily-minority areas which included St. Albans, Springfield Gardens, and Hollis, as well as South Jamaica, South Ozone Park, Baisley Park and Richmond Hill.

The "Choice of Admissions" program continued into the next school year 1974–1975. The program placed 1,974 students in the eight receiving high schools. In 1975 the Andrew Jackson zone was added to the Choice of Admissions area. Two schools were added to the list of receiving schools, John Adams and Richmond Hill, and, the Jackson required attendance zone having been eliminated, Andrew Jackson was added as a receiving school for the Choice of Admissions area. Since the beginning of the September 1975 school year no child has been compulsorily assigned to Andrew Jackson. Under the program 3,598 students were assigned in 1975 and 3,338 were assigned in 1976.

In June 1975 plaintiffs in the present case petitioned the Commissioner of Education to set aside the Board's establishment of the Andrew Jackson attendance area as a "choice of admissions" area for the 1975–1976 school year. In a decision of December 18, 1975, (*Matter of The Parent Association of Andrew Jackson High School*, 1975, 15 Educ.Dept.Rep. 235) the Commissioner reviewed the zoning background briefly and then said:

"It appears from the record that respondents continued their efforts to check the attrition of white students through such actions as the alteration of attendance zones, more careful monitoring of requests for variances, institution of special programs and additional foreign languages, provision of additional staff, retention of utilization rates at a level sufficient to retain the school on single session, and, ultimately, by the abandonment, in 1973, of the continued use of enclaves in favor of designation of the former enclave zone as a choice of admissions area.

"Today, Andrew Jackson High School is virtually an all-minority school. In 1974, approximately 2% of the children in attendance were white while the remainder were black or Hispanic. The zoning plan proposed by the chancellor, as modified by the city board, calls for the designation of the entire Andrew Jackson attendance zone as a choice of admissions area. Each student zoned into Jackson may elect to attend any one of eight integrated high schools elsewhere. While it is true that no students will be compelled to attend the segregated facility, it is equally apparent that any meaningful attempt to desegregate it (as opposed to providing an integrated experience for those who voluntarily choose to attend) has been abandoned."

The Commissioner noted the Board's answer that demographic changes and other factors beyond the Board's control, accounted for the imbalance at Jackson, that the Board's continued efforts to prevent Jackson from becoming a racially isolated school had failed, that, except for Jackson and August Martin (also a "choice of admissions" school), all the other Queens high schools functioned as integrated high schools, and that the "choice of admissions" program was "the best practical way" to give all the pupils in the area "an opportunity to attend integrated schools, without at the same time weakening viable integration in the other high schools in the borough." The Commissioner rejected the Board approach. He said (15 Educ.Dept.Rep. at 238–239):

"The Board of Regents has consistently affirmed the importance of quality integrated education in the public schools, stressing the educational necessity for exposing a student on a personal basis to the cultural richness and individual diversity of his neighbors. In February 1975, the Board restated its conviction that 'equal opportunity for high quality education is the right of every pupil in the public schools of this State, regardless of race, color, or creed' and noted that '[T]he Regents believe that integrated schools are essential to assure that primary right

to all pupils residing in racially diverse communities.' 'An integrated school,' the statement continued, 'is one in which the racial composition of the student body reflects the pupil population of the district without necessarily attempting to be proportionate to it, and in which the programs, facilities, and equipment are not racially identifiable.'

"Andrew Jackson High School is not an integrated school by any conceivable standard. The student population is almost exclusively black and Hispanic in a borough in which 59% of the public high school students were white during the 1974–1975 school year. Accepting the accuracy of respondents' figures, the chancellor's zoning plan for the Queens high schools for the 1975–76 school year will result in three high schools which will have a student population which is between 70 and 77% white, 14 high schools with white student populations varying between 44 and 67%, one school which will be only 35% white, August Martin High School which will have a 5% white student population, and Andrew Jackson High School which will have a projected white enrollment of 2%. Clearly, Andrew Jackson High School is a racially identifiable minority high school in a borough in which white students constitute in excess of 50% of the public high school student population. Under these circumstances, the New York City Board of Education should not have approved a plan which made no effort to bring to those students who would not affirmatively choose to attend high school elsewhere the educational and social benefits of a quality integrated educational experience.

"Freedom of choice or choice of admissions is rarely an effective technique for achieving integrated education unless it is used in conjunction with other integration measures. No such additional measures are proposed under the chancellor's plan. I must therefore find that the New York City Board of Education acted in a manner contrary to sound educational policy when it approved a plan which relegated Andrew Jackson High School to perpetual segregation, leaving an escape route only to those who are able to utilize it."

The Commissioner ordered the Board to (15 Educ.Dept.Rep. at 240):

". . . submit to me, by no later than March 15, 1976, a plan for the racial integration of Andrew Jackson High School, to be effective September 1, 1976. Such plan shall have the effect of insuring that the racial composition of the student body of the school reflects the pupil population of the borough of Queens, without necessarily being proportionate to it.

"Such plan shall also include a local grievance procedure, incident to the implementation of such plan, for parents who believe that the rights of their children to health, safety and quality education have been imperiled, contravened or denied as a result of their school assignment in accordance with the integration plan."

It will be noticed that the Commissioner's opinion assumed that more than half of the Queens high school students were "others". The Board promptly petitioned for a re-opening of the December decision and presented in its support much demographic data, meanwhile submitting a plan in response to the December order. On May 18, 1976, the Commissioner issued a new decision, and, accepting the argument of the demographic data, he said (15 Educ.Dept. Rep. 483, 484–485):

". . . The information now before me compels the conclusion that any significant revision of attendance zones or reassignment of students to achieve greater integration at Andrew Jackson High School will adversely affect racial integration in other high schools in the borough which presently are integrated.

"Any plan for achieving greater racial integration in a particular school must take into account the demographic realities which affect other schools in the system. Any plan must be both effective and feasible. Where a district or borough already has, or will shortly have, a

public school student body which is predominantly nonwhite, particular care must be taken to ensure that efforts to achieve greater integration in some schools do not destroy or seriously impair the integrated status of other schools. Where demographic projections indicate that the nonwhite majority will continually increase with the passage of time, it is imperative that resegregation of integrated schools be avoided. Any integration plan, and particularly in circumstances such as these, must have the greatest possible long-range validity by taking into account demographic trends as well as current circumstances, with the objective of achieving the greatest degree of stability consistent with true equality of educational opportunity for all students in the school system.

"The percentage of white students in high schools of the borough of Queens has declined precipitously during the past decade. In 1966, nearly 80% of students attending academic high schools were white, while more than 60% of those attending vocational high schools were white. In the current school year, 56% are white and 44% are black or Hispanic. And the projections now before me indicate that by 1980 minority group students will constitute 59% of the student body of the Queens high schools and that the percentage of whites will decline to 41%.

"This apparently inexorable trend, unless reversed by factors over which the school authorities have no control, will ultimately result in a predominantly nonwhite student population in most of the high schools of the borough. In the meantime, however, there are still a significant number of well-integrated schools in the borough. Since any substantial reassignments with respect to Jackson would necessarily affect schools which are still integrated, I am compelled to conclude that the compulsory reassignment of students to and from Andrew Jackson High School will impair rather than enhance racial integration of the high schools of the borough as a whole.

"Since substantial reassignments of students will be counterproductive, other ways must be found to enhance educational opportunity for students residing within the Andrew Jackson attendance zone."

The Commissioner emphasized the need for developing additional programs for the school, including "magnets", and for expanding the roster of receiving schools, adding (at 486):

".  .  . Respondent may establish procedures to ensure that except with respect to those schools previously designated by it as receiving schools, no student residing within the Andrew Jackson attendance zone may designate an alternative school in which the current utilization rate exceeds 125% of the stated capacity of the facility. Such procedure shall also ensure that no student of black or Hispanic origin may select a school in which the percentage of students of such origin exceeds the borough-wide average in the borough in which the school is located, nor may any white student select a school in which the percentage of white students exceeds the borough-wide average in the borough in which such school is located. Respondent shall develop a plan under which transportation will be provided, as required by law or district policy, to those students who exercise such options."

Cooperative programs with schools having a higher ratio of "others" were recommended as a means to interracial educational experiences. The order directed the Board to ".  .  . submit to me, by no later than June 8, 1976, with copies to opposing counsel, amendments to the plan submitted by respondent on or about March 17, 1976 to provide for expansion of the choice of admissions program and for cooperative interschool educational programs for students of all races  .  .  ."

The Board submitted revisions to its plan, and the Commissioner, on July 1, 1976, accepted the plan and ordered its implementation. The plan excluded as receiving schools the special schools (New York Edu-

cation Law—§ 2590–g(12) provides for their continuance). The plan is somewhat complex. The text of the plan is attached as Annex A. As applicable to Jackson it provided the following:

All minority (*i. e.*, black and Hispanic) students in the Jackson attendance zone have "open admission options" to attend *any* City high school

in which the percentage of "white students" exceeds 50% *or* the borough's white percentage (whichever is *higher*), provided the school's utilization is below 125% *or* it is already a receiving school;

*however*, the number of minority students to be admitted to any one receiving school in one year (adjusted for cognate admissions) may not exceed the number which in that year would change (1) the schools white-minority ethnic balance by 4% or (2) change that balance by more than one fourth of the difference between the school's current white enrollment and 50%, whichever is *lower*;

White students in the Jackson attendance zone have the option of attending any City high school in which the percentage of white students is lower than the borough's white percentage *or* is less than 50% of the school population, whichever is *lower.*

"Borough" means the borough in which the receiving school is located.

The plan explained the principal considerations accounting for its limitations on the options. The plan rejected using the borough average of "others" as the criterion of eligibility to be a receiving school on the ground that to send minority students to a school already over 50% minority would not serve either the long-range or the immediate goal of giving integration opportunities to the children in the receiving school's zone or the children assigned under their admissions options. The "controlled rate of change" factor, taking account of the quantum of ethnic change produced by each year's admissions, was intended to provide the integration plan with long-range validity and stability.

It is suggested and much evidence was directed to showing that the Commissioner's December 1975 decision was rescinded amid pressures exerted by certain of the Regents and by legislators, in each case evidently expressing views shared by their constituencies, or, at least, by articulate segments of their constituencies. The evidence is in conflict. There is much in the record of the Regents' proceedings, in the correspondence and in the material that the December decision itself evoked to make it plain that a Commissioner of Education who intended to take affirmative action to assure to children living in racial isolation quality integrated education had best be gifted with intrepidity. The Commissioner met with much that must have convinced him that many who professed a strong belief in quality integrated education as a primary right of each child in the state were not prepared to approve practical means of assuring that right to the urban minorities, and were rather disposed to see the principle consumed by its exceptions. The enactment and invalidation of Chapter 342 of the Laws of 1969 (*Lee v. Nyquist*, W.D.N.Y.1970, 318 F.Supp. 710, aff'd 1971, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105), forbidding the assignment of children to a school on account of race or for the purpose of achieving changes in the attendance of children of particular races and national origins, had not exhausted the resolution of those who favored such legislation, and, indeed, two bills, the first of which the Governor disapproved, and the second of which became law, were introduced in the legislature in 1976 for the purpose of expanding the scope of judicial review of the Commissioner's orders. See Laws of 1976, Chapter 857, amending Education Law § 310.

Nevertheless it is concluded that the Commissioner's decision of May 1976 was based on the considerations he assigned for it, particularly the risk that "equalization" would produce "resegregation" of integrated schools, and that it did not reflect yielding to pressures that superseded the Commissioner's own judgment. It is true that

the 50% limitation appears, at least superficially, to be at variance with the more general principle, earlier stated, that school populations should reflect without necessarily being proportionate to the pupil population of the district; but that expression of principle was, in the Commissioner's earlier quotation of it, qualified by the opinion's caution against impairing the integrated status of other schools. Again, the direction of change over time central to much of the Board's administrative concern and to its argument in the present case, was claimed to affect if not control the application of the "population of the pupil community" criterion. The Commissioner expressed the same concern, saying in his July 1, 1976, decision of the "rate of change" element in the plan:

"Although use of a rate of change factor might in individual instances place constraints upon the ability of a minority group student to designate a particular facility, a policy of unregulated or uncontrolled use of open admissions options may make integration efforts illusory. Unlimited educational options, especially in neighborhoods in ethnic transition, may well undermine the stability essential to maintenance of any long-range plan for achieving true educational opportunity for the greatest number of students over the longest period of time." (Exhibit 70)

The Commissioner's approval of the plan[3], was not, it would seem, based on a conviction of its theoretical soundness; he said:

"Respondent's plan is far from ideal, but in view of the demographic realities it constitutes a viable basis for providing a quality integrated educational experience for the greatest number of children for the longest period of time." (Exhibit 70)

It was not the Commissioner's testimony that the result of the controlled rate of change plan was to integrate Andrew Jackson, or make it a desegregated school; there was no compulsory assignment of pupils to it; he considered that the Regents' standard of "reflecting the pupil population of the district" assumed that the district was a majority "other" district, and, believing that a school had to be majority "other" to be integrated, considered that for children in a school like Jackson other means of gaining an integrated educational experience would have to be used. The Commissioner indicated that, at least where district (or borough) wide integration was not feasible, the goal would be to give for as long a period as possible as many students as possible an integrated educational experience.[4]

The outcome of the plan is implicit in the ethnic ratios in the borough's academic high schools. The choice of admissions program for 1975 assigned 3,598 children to nine high schools; 951 were assigned to Jackson, 589 to van Buren, 481 to Bayside, 362 to Cardozo. In 1976 when action under the July order affected the operation of the program, 3,338 children were assigned to eleven schools, 805 to Jackson, 625 to van Buren, 450 to Bayside, 362 to Cardozo. Not all children can attend the school of their first choice, and the selection process, which could not function according to plan in

3. The approval order, like the earlier order, required the Board to establish a grievance procedure for parents who believed that the school assignments impaired their children's rights to health, safety and quality education. The order required the Board to file semi-annual reports of action taken and of the Board's judgment as to the effectiveness of their action.

4. The Board in its supplemental petition for reopening referred to the definitions section of the Emergency School Aid Act (20 U.S.C. §§ 1601, et seq.); particularly Section 1619(11) defining "minority group isolated school" as one in which minority children make up more than 50% of the enrollment; Section 1619(6) and (7) define integrated school for special purposes of the Act in terms which emphasize the presence in the school of a "substantial proportion of . . . children . . . from an educationally advantaged background." For one purpose, the proportion of minority children must be at least 50% of the minority proportion in all schools of the local education agencies in the Standard Metropolitan Statistical Area. For another purpose the number of "other," children may "in no event" exceed 65%. The Commissioner had noted the reference to Section 1619(11) in the Board's petition.

1976, but only through transitional expedient, did result in some children's being assigned to Jackson as their fifth choice, but in the current year that was not the case.[5]

The Choice of Admissions program imposes on all the children in the Choice of Admissions area who elect to travel in order to attend a high school of their choice, a greater average burden of travel than is borne by children attending regularly zoned integrated high schools. The evidence is that most high school students use public or private transportation to reach their schools, but the children in the Choice of Admissions area are predominantly black or Spanish-surnamed children, and, if they wish to attend an integrated high school, they must assume on average a heavier travel burden than does the average minority or "other" student who lives in the attendance zone of an integrated high school. To what extent the travel burden inhibits the choice of integrated schooling is not quantified in the record, perhaps is not fairly measurable, but it can scarcely be excluded from consideration as a deterrent factor.

A very great deal of evidence was presented, over objection, concerning education at Jackson and Jackson's reputation with guidance counselors at the feeder schools, among the public high school teachers of the borough generally, and among the parents of the general area who have taken an active interest in the school. The data concerning education at Jackson had a twofold relevance: to answer the questions whether Jackson was discriminated against in the administration to and through it of educational services, and whether it was, or had become, a school having a ratio of the educationally disadvantaged, or educationally handicapped, such that the student body as a whole was denied equality of educational opportunity, and any measure of the experience of integrated education. The record on this aspect of the case is more complete, perhaps, than on any other aspect. In addition court and counsel visited on one day, both Jackson and Jamaica High Schools.

The visit to the two schools in the first place gave some reassurance that the very complete record being made in the case fairly reflected the schools. The two schools did not present a contrast except in the evident difference in ethnic ratios. Both schools were orderly in class and in the corridors during the change between classes. The teaching in two classes at Jackson was distinguished, and pupil participation in the classwork excellent; a remedial reading class was small, well staffed, and conducted in quiet good spirit; a history lesson was well taught to a class that was curiously unresponsive, possibly because the subject matter of the lesson was remote from the interests of the class. The visit was necessarily very visible and probably expected by a great part of the children, and it was, if not welcomed, accepted with robust good humor, and with conflicting opinions forthrightly and well expressed during corridor contacts. Over the most recent years the school population must surely have become used to seeing articles about their school in the newspapers.

The evidence requires the conclusion that there has been no discrimination against Jackson in the number and quality of the teaching staff, in course offerings, in class size, in funding (reflected in expenditures per pupil) or in effectively serving the educational need of the pupil population. The testimony is that its principal is outstanding in culture, leadership and student relations, and in community relations. What has been demonstrated in detail is that Jackson is a "Title I" school (20 U.S.C. § 241a *et*

---

5. The choices for Andrew Jackson in the 1976–1977 school year were:

| | Spring Choices 1976 | Attended in 1976–1977 |
|---|---|---|
| First Choice | 318 | 369 |
| Second " | 174 | 89 |
| Third " | 170 | 84 |
| Fourth " | 131 | 65 |
| Fifth " | 105 | 59 |
| | 898 | 666 |

seq.), by reason of the number of children in school from families having an income below a level determined by the federal statute; the whole of the Choice of Admissions area is a Title I qualifying area. But by no statistical measure is Jackson denied a share of available funds comparable to the other schools.

The total conclusions from the evidence about the school is that in the more recent years the number of children requiring remediation has increased, that the ratio of "applied" courses to regents or strictly academic courses has increased, and that the school's ethnic identification has affected the flow to it of applicants for admission. Its "reputation" has had a checkered history going back to the 1940s before it became racially identifiable. But the program of the school appears genuinely to be designed to meet the educational needs of the children who present themselves, to motivate them, and to educate them to the limit of their ability; remediation is an important part of the educational effort, calculated to raise the children's basic skills to the level at which they can continue their education or enter the world of work. The principal summed it up in saying that the school was geared to the needs of the children who presented themselves for instruction. The school admits more students with poorer skills than in the past, but apparently the case is the same for the children in the choice of admissions area who were assigned to the other schools. Fewer regents and honors courses are offered than in the past, and the school has modified its programs to deal with the students' learning deficiencies. Jackson's student body is college oriented and has had and continues to have a very high percentage of its graduating class accepted in college, the highest of all the Queens academic high schools in 1973 and 1974, tied for first place with another school in 1975, and fourth highest in 1976. Recently Jackson had two Westinghouse scholarship runners-up, both of whom were black; there were no other black students from Queens who were runners-up.

The evidence presented about different disciplines reflected the school's methods of fulfilling its mission. The traditional science courses (other than advanced biology) had fewer classes and fewer regents classes than in the past but well-conceived applied science courses and courses addressed to new fields of technical employment are offered as well as "modified" courses, and slide illustrated package units. In the mathematics department there were 76 classes, 34 of which were remedial mathematics, and 42 regular mathematics classes, 23 of which were 9th grade or below. There is one honors class of 16 in the 9th and one of 20–23 in the 10th grade, and one 12th grade class, combining introductory calculus and advanced algebra, in which there are 10 students. There are two computer classes with 14–16 students and 3 optional regents classes in the 11th year. The course offerings in mathematics are fewer and less advanced than in Jackson's past and in some other Queens high schools. In addition 20 below grade level courses were taught in the accounting department. In foreign languages Jackson offers only French and Spanish (before 1971 it offered six); the classes are good ones, and the students hold their own in the language regents examinations. The department head finds the students more highly motivated and more college-minded than she found the students at the predominantly white John Adams High School when she taught there. She observed that Jackson did a good job with the students who needed remediation. (The witness thought that with some Jackson had a bad reputation which she considered was both undeserved and, to the extent that it came to the students ears, harmful to them.)

The magnet programs at Jackson have an individual history. The music program was meant to attract students from all over the borough by offering a fuller music program

See also Exhibit EJ, reporting to the Commissioner on the effectiveness of the plan: for the school year 1977–1978 total assignments were

3056. The number assigned to Jackson was 595, and, as noted, included no "Fifth Choice" students.

than any other Queens high school. Originally it was a big program with 33 course offerings 9 periods in piano (with use of an expensive piano laboratory), and theory courses as well. But attendance has dwindled and course offerings are not currently markedly above the offerings in the other Queens schools. Graduates who have majored in music have gone on to college and received exemption from some college work on the basis of their work at Jackson. The Art program was intended to attract students from all over Queens. Admission is by examination. The number of students has declined and the department head thought that because of Jackson's reputation it was increasingly difficult to attract middle class children, black or white. The program is not like that of the High School of Music and Arts, but 18 fine arts and 22 industrial arts courses are offered, and some are offered which are unique in the system. Students in the program exhibit at gallery, museum and industrial art shows around the City. The program includes a cooperative program with Queens College in which instruction in the silk-screen process is given at Queens College once a week.

The law magnet program is still in process of self-definition. It is not a pre-law but a pre-citizenship program; it is linked with regular instruction and emphasizes law infusion in all disciplines, *e.g.*, in science, forensic science, and in English. The program is somewhat unstructured, as described in the evidence, and its practical strength appears to lie in the fact that the students are selected, that attendance is better than the school average and that the students' absences are followed by home telephone calls. The program has no written syllabus, and is evidently still in the formative stage. It grew out of a "school within the school" with a theme in communications and was converted to the law magnet in the spring of 1976. See Exhibit EH.

The school then is not either in staff, or facilities, or course offerings, in any respect inadequate to its educational tasks. The clear impression from the principal, the assistant principals (who are department heads) and the teachers who testified is that the staff takes pride and feels it can confidently take pride in the educational enterprise they are conducting. Jackson is the farthest thing in the world from being a blackboard jungle. The staff plainly think that they have a highly motivated student body, much of it in need of remedial training, but a student body disposed to overcome its educational disadvantages and move on to higher education. The evidence does not support the conclusion that anything has been withheld from the school because it is a black school or a Title I school.

The data on reading and mathematics grade level (*e.g.*, Exhibit EC) do indicate that a large percentage of Jackson students have substantial deficiencies in these basic skills, but the data show also both that the program at Jackson materially reduces the disadvantage shown in the raw scores, and that the deficiencies are common to a great many of the high schools, other than the special schools (*e.g.*, Stuyvesant and Bronx High School of Science). See Exhibits BR, BT through BX. The SAT scores are not high. But these measures of deficiency and remediation are not planned outcomes or neglected aspects of the Board's provision for Jackson. They present the dimensions of the educational task that the school represents, but the evidence does not warrant a finding that the Board has failed to recognize the nature and extent of the task and to provide for it so far as resources have been available to it. *A priori*, there is a temptation to infer that the very nature of the open admissions program for the choice of admissions zone predestines Jackson to the status of a school for the educationally disadvantaged. The evidence does not support a confident inference that Jackson receives, or inevitably must receive a markedly disproportionate share of educationally handicapped choice of admissions zone students.

The attendance data on Jackson as against the borough average does not show it to advantage, but its average attendance in 1975–1976 at 72.5% was better than W. C.

Bryant's (70.5%), and not significantly lower than that of Springfield Gardens (74.2%), Flushing (74.7%), Far Rockaway (74.2%), Richmond Hill (73.9%), John Adams (74.2%), and Grover Cleveland (74.8%). The city wide average attendance was 71.0%, and the city wide Title I school average attendance was 64.8% (Exhibits 190,264).

Demographic change has been the dominant factor in the history of Jackson. Neither the Commissioner nor the Board brought about the demographic factors that were recognized as imposing a public duty to act to compensate for the demographic change that would make Jackson an imbalanced and ultimately segregated school.

The policy and practice of the Board have been complex. The evidence requires the conclusion that it has been pursued with a professional skill and depth of humane concern that is impressive. There is no evidence that the Board has sought to segregate minorities in identifiably minority schools or has taken any action for the purpose of segregating minority students. The inquiry here is not into the good faith of the Board but into the constitutional validity of the policy of integration that it has effected in Queens, with particular reference to the Andrew Jackson High School and its students.

Such *de jure* segregation by race as may once have existed in New York in the now distant past is not a factor in the analysis of the present case. There was no "dual" system created by old law to be dismantled, as in *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. But what is drawn from *Brown* for all applications is the critical holding that disposed of *Plessy v. Ferguson*, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, that is, that "Separate educational facilities are inherently unequal." (347 U.S. at 495, 74 S.Ct. at 692.) And from *Green v. School Board*, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, a case passing on the adequacy of the means belatedly used to desegregate a "dual" school system, is drawn the holding that granting all the children in a district "freedom of choice" between two schools that

had long been totally segregated is not an adequate means of desegregating the two schools when the result is that no whites choose the traditionally black school, and only 15% of the blacks choose the traditionally white school. *Green* was a dismantling case, but its principle stands free of the immediate context of its application. In *Swann v. Charlotte-Mecklenburg Board of Education*, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, again a dual system disestablishment case, the Court countenanced the use of the district ratio as a base-line for desegregating all the schools in the district, a metropolitan one, observed that the existence of a small number of virtually one-race schools is not itself the mark of a system that "still practices segregation by law", noted that an optional "majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan" and must also grant the transferring student free transportation and an assurance of space in the receiving school, indicated that creation of noncontiguous zones in the course of disestablishing dual systems is an available expedient, but that, in the absence of a need to rectify a constitutional violation, there would be no basis for a court's ordering assignment of students on a racial basis, and that transportation of pupils to effect desegregation was valid when the time and distance of travel were not so great as either to risk the health of the child or significantly impinge on the educational process. As will be seen from the facts in the present case the expedients referred to in *Swann* have been used by the Board in its efforts to arrest, if not reverse, the tendency of "neighborhood schools" to become segregated schools,

*Keyes v. School District No. 1*, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, dealt with the desegregation of a school system that had never been segregated by statute. The Court found that a course of administrative actions uniformly tending to isolate the minority in minority schools, with the implicit potential of affecting the racial composition of residential neighborhoods, could form the predicate for a find-

ing of the existence of a dual school system. The Court held that a finding of intentionally segregative school Board actions in a meaningful portion of a school system creates a presumption that other segregated schooling within the system is not adventitious. The Court said (413 U.S. at 208, 93 S.Ct. at 2697):

"We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* is *purpose* or *intent* to segregate." (Emphasis in original; footnote numeral and footnote omitted.)

The Court made clear that proof of racially neutral explanations for the school board action was not enough; the school board's burden is to show that "segregative intent was not among the factors that motivated their actions." *Keyes* is of limited relevance here: it dealt with whether the school board's acts of deliberate racial segregation in the Park Hill schools region could be the basis of a finding that the school board had also engaged in an unconstitutional policy of deliberate segregation in the core city schools. Mr. Justice Powell (concurring in part and dissenting in part) would have moved forward in judicial history to make explicit that the equal protection clause now requires school boards to operate integrated school systems within their respective districts. The special significance of *Keyes* is in its clear recognition that purposive official conduct that produces segregated schools is state action violative of the constitution.

*Pasadena City Board of Education v. Spangler*, 1976, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599, held that once a school board had established, under court order, a racially neutral system of student assignment, it could not be required annually to take steps to compensate for demographic changes that were beyond its control; "these shifts were not attributed to any segregative actions on the part of the peti-

tioners," the school board. The case may be thought to continue the Court's present unwillingness to go beyond protecting the minority student against purposeful segregation.

Much that is said in Mr. Justice Powell's opinion on the Court's remand of *Austin Independent School District v. United States*, 1976, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603, is aptly descriptive of the problems that have confronted the Board of the New York City School District. He said (429 U.S. at 994, 97 S.Ct. at 519):

"The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private—cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns." (Footnote numeral and footnote omitted.)

But the *Austin* case itself has not changed the controlling legal considerations. Nor has *Dayton Board of Education v. Brinkman*, 1977, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851; like *Pasadena* it observes that the circumstance "that many of [Dayton's] schools are either predominantly white or predominantly black without more, of course, does not offend the Constitution"; and, again, the case makes clear that any remedy must be commensurate with the constitutional violations. But *Milliken v. Bradley*, 1977, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745, demonstrates that the remedy, while it must be determined by the nature and scope of the constitutional violation, may go beyond simple pupil assignment and may order remedial and compensatory programs.[6]

---

6. *Hills v. Gautreaux,* 1976, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792, throws a different light on the metropolitan solution problem treated in *Milliken v. Bradley,* 1974, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069; it deals

with a different problem from that in *Arlington Heights v. Metropolitan Housing Development Corp.,* 1977, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450.

The principal cases have been reviewed most recently in *Arthur v. Nyquist*, 573 F.2d 134, at pages 141–143, 2d Cir. 1978, and the court has affirmed the "foreseeable consequences" test, as it was explained in *Hart v. Community School Board of Education*, 2d Cir. 1975, 512 F.2d 37, that is, that a finding of *de jure* segregation can be based on acts of omission, or commission, undertaken by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. *Cf. School District of Omaha v. United States*, 1977, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039.

The concern in the present case is not at all with "segregative intent" as that matter has come up in the cases discussed, and the many others of which they are representative. Those cases dealt with the effort to determine whether in fact the seemingly neutral conduct or measures were meant to have a segregative effect. If that were the inquiry here the answer would be that there was no covert purpose to segregate concealed under practices that professed to be directed to integration. The evidence requires the conclusion that the Board has striven throughout to avoid racial imbalance in the schools, to redress it where it could, and to compensate for it where it could not.

The inquiry here is whether the specific plan approved under the Commissioner's July 1, 1976, order and since implemented is invalid because it denies some or all of the students in the choice of admissions area the equal protection of the laws, and it must be concluded that it does: it is by its terms constitutionally invalid.

The Board's policy is one of affirmatively seeking to integrate the schools as a principle of education. That has meant the use of zoning to offset demographic change, to counteract segregated housing patterns. The policy was and is real, and is well illustrated in Jackson's zoning history. School siting was a second element of the integration policy. Schools were not sited where, if they opened as neighborhood schools, they would be minority schools or heavily imbalanced toward the minorities. Schools were sited in what appeared to be stable middle class residential areas that were very predominantly white. The siting policy interacted with the zoning policy necessarily. These policies were underpinned with free choice transfers for children in elementary school, transfers that put them in a feeder school of the high school of their choice. Enclave zoning, as in the Jackson zone's history is a further method of pursuing the goal of offsetting imbalances.

The steady change in the ethnic composition of the school population has made the problem of integration difficult, challenging even the concept of integration that is relevant to the City School District today. The policy of the City School District excludes the creation of white sanctuaries in principle. New York, like others of the great cities, sees at its borders the suburban schools, where the minorities are a small percentage of the pupil population, a condition that defines and increases the sense of racial isolation of the minorities in the city schools. At present these are seen by the City School District as the magnets and the white sanctuaries that compound its problems. See Exhibit 49.

Given the Board's policy, its application to Jackson and to Queens raised the issue of the limits of the policy. Should each school of a region—borough or district or other definable integral area—reflect the ethnic composition of the whole region within reasonable limits of approximation? The policy position of the Board and of the State Department of Education was that when minorities exceeded 50% of the school population such "equalization" should not be pursued. In the Board's view it would accord few students a truly integrated education experience and would, indeed, exaggerate the segregation within each school because of the differences between the extent of the need for remedial instruction of the minority children, with their higher ratio of poverty backgrounds, as compared with white children, more frequently from the middle class. Integrating a school does not assure integrated classes in the school. The

Board's experience is that when schools are over 50% non-white, its ethnic ratios change at an increasing rate.

Hence the December 1975 order of the Commissioner, in the view of the Chancellor of the City School District, would have required major rezoning with the consequence that most of the Queens high schools would have been, in his view, racially imbalanced. In the Chancellor's educational philosophy (as in the view of the State Chancellor) "imbalance" is reached when the student body is more than 50% non-white. Under the "controlled rate of change" plan schools with 50% or more white students would continue in Queens until 1985, and that, in the Chancellor's view, is preferable to equalizing all the schools.

Having to choose among alternatives the Board of Education chose the controlled rate of change plan on the ground that it was the plan best calculated to give the largest number of children an integrated education over the longest period of time. The position is graphically presented in Exhibits M and N. Exhibit M points out that under the equalization plan no child in Queens will be in an integrated high school after 1978. All will be in schools that are 35 to 50% "other" until 1982 and after that all will be in schools that are 10 to 35% "other". Exhibit N shows that on the controlled rate of change plan until 1987 there will be high schools with 0 to 10% "other" populations, schools with 10 to 35% "other" population, schools with 35 to 50% "other" population, and schools with 50 to 80% "other". That is, the plan is designed to and does continue schools with 50% "other" as long as possible. (There are no Queens schools currently that are over 69% "other". Exhibit CM shows graphically the distribution of the 46 Brooklyn and Queens academic high schools by percent of "others" classes. One-half fall in the 50 to 80% "other" class.)

As the controlled rate of change plan is working currently, it distributes the students among the Queens academic high schools as follows:

TABLE III
Schools grouped by percent "Others"

| | 0 – 10% | 10 – 35% | 35 – 50% | 50 – 80% |
|---|---|---|---|---|
| Number of schools in group | 2 | 2 | 6 | 10 |
| Number of minority students each group | 4,313 | 5,654 | 10,730 | 14,062 |
| Number of "others" each group | 25 | 2,508 | 8,777 | 21,551 |
| Percent of all Queens minority students in each group | 12% | 16% | 31% | 41% |
| Percent of all Queens "others" in each group | 0% | 8% | 27% | 65% |

The distribution shows that 65% of the "others" are in the schools that are majority "other" and 41% of the minority students are in those schools. The distribution does not show the radical distortions dealt within many of the reported cases, and it can be thought to demonstrate a substantial reduction of the segregative impact of demographic change.

Nevertheless, the plan is violative of constitutional right. The principle of the plan's operation limits minority pupils' access to schools because of their minority status in order to provide integrated schooling for as long as possible to a progressively limited number of minority and other students. The goal of the controlled rate of change plan is the education of the largest possible number of children in schools in which the majority of the students are white for the longest possible time. That is a forbidden goal because, for all the candor

of belief in the educational need for and value of integrated education, it recreates a dual school system, a system of integrated schools and schools in which the pupils are not accorded an integrated education. The choice of admissions principle does not operate over a range of reality—if this is a field in which a choice between the alternatives offered is permissible—for it is the essence of the plan that the choices of integrated schools are so few that until 1987 some schools will have 50% "other" student bodies, as the remaining schools become increasingly isolated racially. *Cf. Green v. School Board, supra,* 390 U.S. at 441, 88 S.Ct. 1689. It is to be remembered that there is no racial or ethnic majority in the City School District. Blacks, the Spanish-surnamed and "others" are each a minority of equal right.

The constitutional fallacy underlying the plan necessarily requires invalidation of the Commissioner's order of July 1, 1976 and his order of May 18, 1976, since the latter order limited the choice of minority students to schools in which the minority percentage did not exceed the borough-wide average for the borough in which the receiving school was located.

■ Plaintiffs seek to amend the complaint to invoke the provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*; no new facts were sought to be introduced, and it may be doubted that plaintiffs have satisfied the conditions precedent for obtaining the relief specifically authorized by that Act and not available in actions under Sections 1981 *et seq.* of Title 42 of the United States Code. Plaintiffs' interest in Title VI is principally related to burden of proof rather than to substantive principle, and to the extent that the legal concepts of Title VI are germane to the present case, they must be considered to be in the case.

■ Plaintiffs seek also to add as parties defendants nine Nassau County school districts and their school board members. The motion was made formally after the close of all the evidence. Its support lay in the testimony taken in the July session which supported the view that the county and school district lines were not significant of any societal factor relevant to education and the attainment of the goal of equality in educational opportunity and experience. Plaintiffs' case in chief included evidence directed to showing the effect of federal, state and local action in the housing field as a factor in producing segregation in housing. Chancellor Anker, too, in his evidence emphasized that, as the schools of the City School District became increasingly schools in which the "others" were in a minority, the bordering school districts remained over 90% "other", and that within the suburban and exurban counties there were school districts that were heavily minority (e. g., Hempstead and Roosevelt) located amid school districts that were predominantly "other". The July evidence was addressed to presenting evidence of governmental complicity in the creation of what Mr. Justice Marshall described as "a growing core of Negro schools surrounded by a receding ring of white schools" (*Milliken v. Bradley,* 1974, 418 U.S. 717 at 799, 94 S.Ct. 3112, at 3153). The considerable literature concerned with probing the bases of segregation in housing has certainly suggested the need for reconsidering the assumption that demographic change is a neutral history of uncontrolled human acts, and to reconsider the view that if school boards are free of responsibility for the existence of segregated schools, the inquiry is at an end. It may be that the dispersion of governmental authority among different agencies of government cannot produce freedom from constitutional responsibility. But the application to join the school districts would almost certainly require trying again many issues that have been tried with great care, would inevitably delay the case further, and, in the present state of the law, could not have a sufficiently lively prospect of success in reaching a metropolitan remedy with finality to justify surrender of the alternative of turning again and immediately to the Board of Education for a local remedy. In the circumstances, to make tentative findings based on the July evidence would be a

disservice to the fair trial of the metropolitan remedies issue on a record directed to those issues made with the Nassau parties present throughout. The motion to add the Nassau school districts as parties defendant is denied.

That does not mean, however, that the time is not again at hand when the City School District might consider the feasibility and utility of interdistrict action and the Commissioner foster resort to interdistrict cooperation, modification of district boundary lines, consolidation of districts, and every other instrument in the arsenal of the Board and of the Commissioner.

It is

ORDERED that the orders of the Commissioner of Education of July 1, 1976, and of May 18, 1976, are set aside; and it is further

ORDERED that the City School District of the City of New York and the defendant members and officers of the Board of Education of the City of New York are enjoined from carrying out the controlled Rate of Change Plan as approved by the Commissioner's order of July 1, 1976, for the school year commencing September 1979 and thereafter; and it is further

ORDERED that the defendant representatives of the City School District submit to the Court and to the Commissioner of Education within forty-five days a plan for the desegregation of the Andrew Jackson High School substantially in accordance with the Commissioner's order of December 18, 1975, incorporating in the plan transitional provisions to the extent feasible for modifying the application of the Controlled Rate of Change Plan to pupil assignments in the school year commencing in September 1978; and it is further

ORDERED that the present order is not intended to prevent the Board or the Commissioner or both from presenting other constitutionally valid plans which will eliminate the violation found by this decision and which will in their judgment better serve the educational needs of the student bodies involved; and it is further

ORDERED that the motion to amend the complaint to include reference to Title VI of the Civil Rights Act of 1964 is granted and the motion to add the Nassau County school districts as parties defendant is denied.

### ANNEX A

### PROPOSED PLAN FOR PROVIDING THE STUDENTS IN THE ANDREW JACKSON ATTENDANCE ZONE WITH A MAXIMUM FEASIBLE OPPORTUNITY FOR AN INTEGRATED AND A QUALITY EDUCATION

1. *Choice of admissions program*: At present every student in the Andrew Jackson Attendance Zone may select a high school from a group of eight integrated high schools which are located essentially in the northern part of Queens. In 1975, approximately 2147 students from the Andrew Jackson attendance zone attended these integrated high schools via the choice of admissions program, and in the past four years, a total of approximately 5952 students from the Andrew Jackson attendance zone attended integrated high schools through this program. Also, in 1975, an additional 3,432 students in the Andrew Jackson attendance zone who, previously, had been attending integrated lower schools under the Board of Education's Open Enrollment Plan, attended integrated high schools located in the zone of the lower school they had been attending rather than Jackson. Thus, in 1975, alone, a total of approximately 5579 students in the Andrew Jackson attendance zone attended integrated high schools pursuant to integration plans promulgated by the respondent.

Because of the success of this program, effective September 1976, two more schools, Richmond Hill and John Adams, will be added to the eight receiving schools that are presently in the Andrew Jackson Choice of Admissions program, and thus, the opportunity for students in the Choice of Admissions area to attend an integrated high school will be increased.

2. *Development of a Cooperative Educational Program Between Andrew Jackson and Queens College.* At present, students from the Queens College School of Education are actively involved in many of the programs at Jackson in a tutorial and/or student teaching capacity, and some faculty members of the Queens College School of Education are working with the Jackson faculty.

Respondent proposes an expansion of the relationship between Queens College and Andrew Jackson as follows:

a) Space will be available on the Jackson campus for classes of the Department of Education of Queens College. These classes would be conducted by both Jackson and Queens College faculties. It is contemplated that these classes will provide quality remedial, normal and advanced study opportunities for the pupils at Jackson. For the college students, it will provide a laboratory school experience.

b) As part of this cooperative plan, Queens College students and faculty will join with the Jackson faculty in teaching and tutoring on the high school level, and this will serve to enrich the teacher education program at the college, as well as expand the opportunities for a quality education at Jackson.

4. *A "law-center" magnet school within Andrew Jackson High School*

a) There is presently no high school in New York City that offers the type of "law-center" program that would be offered at the "law-center" magnet school in Jackson. Thus, this program would be open city-wide, with first preference given to residents of Queens.

b) It is contemplated that the law-center magnet school within Jackson would offer a wide variety of law oriented types of courses, including modified law school courses, courses on the criminal justice system, courses on law oriented careers, including police careers, paraprofessional legal careers, governmental careers, and the like.

c) The borough president's office in Queens County has already indicated its willingness to participate in the development of such a program for Andrew Jackson High School.

d) Representatives of the Queens Bar Association, District Attorney's Office, Police Department, law schools, government agencies and outstanding members of the legal profession would arrange an advisory council on the formulation and development of the law-centered program.

e) The Board of Education's bureau of Social Studies would be involved in the development of curriculum material for a law centered school-within-a-school.

f) The Office of Cooperative Education would assist in providing work experiences that are law related.

g) Internships would be developed with law firms and government agencies to provide additional related learning experiences.

h) Additional sources of federal and foundation funds would be sought in career education to provide special services in this area.

5) *Present Magnet Program At Andrew Jackson High School.* The magnet program at the school in music and art will be expanded and its availability to out-of-zone students will be further publicized throughout the borough.

6) *Exploration of the Possibility of Improving Racial Balance at Jackson through Actions Involving the White Schools that are in Close Proximity to Jackson Across the Nassau County Line.* In considering efforts to improve Andrew Jackson's racial balance, the Board has noted previously, the presence of racially isolated white schools that are in close proximity to Andrew Jackson, just across the Nassau County Line. Lawrence, Hewlitt-Woodmere, Great Neck, Elmont, Floral Park-Bellerose, and Herricks all maintain entire school systems that are well over 90% white. Respondents propose that to improve the racial balance at Jackson, the Commissioner of Education should explore the possibility of actions involving these adjacent school districts in Nassau County.

Dated: Brooklyn, New York
March 15, 1976

I. *Expansion of Open Admissions program for Black and Hispanic Students in Erasmus Hall and Andrew Jackson Attendance Zone:*

All Black and Hispanic students in the Erasmus Hall and Andrew Jackson attendance zones will be provided open admission options (on an entering year basis) to attend any New York City high school (except the special high schools designated under Education Law § 2590–g(12)

a) in which the percentage of white students exceeds the borough-wide average in the borough in which the "receiving" school is located, or in which the percentage of white students is above 50% of the total school population, whichever is higher.

b) providing that the utilization of the school is below 125% of stated capacity (unless the school is presently designated a receiving school, in which case the utilization level may exceed 125% although it may be subject to necessary and reasonable restrictions).

Under these criteria, 25 high schools—11 in Brooklyn, 2 in the Bronx, 10 in Queens, 2 in Staten Island—would be eligible as receiving schools for minority students residing in the Erasmus Hall and Andrew Jackson attendance areas (18 with present utilization levels below 125%, 7 with utilization levels above 125%). (see attachment "A")

It should be noted that were the standard for eligibility of a receiving school to be that its percentage of white students equals or exceeds the average percentage of white student enrollment in the borough, only four additional schools would qualify: Tilden, 42% white (exceeding Brooklyn borough average of 41%), Truman 41% white (exceeding Bronx borough average of 19%), Kennedy, 32% white and Seward Park, 10% white (exceeding Manhattan borough average of 10% white). It is clear that to send minority students to schools which have changed rapidly and whose Black and Hispanic population is already 58%, 59%, 68% and 90% can hardly serve to insure long range—or even present—integration opportunities either to the students from Eras-

mus Hall or Jackson or to those residing in the attendance zones of the potential receiving schools.

Under the plan above, Newtown, Flushing and Bowne High Schools in Queens, which have been included in prior plans as receiving schools for students in the Andrew Jackson zone, are not included in this (expanded) list since their white student enrollment in 1975–1976 (42%, 46% and 50%, respectively) did not exceed 50% white (in addition, they are also below the current borough average of 56% white). However, based on the standard stated above, eighteen additional receiving schools for Jackson are listed, including the following three high schools in Queens

| | Percentage white | Utilization |
|---|---|---|
| Beach Channel | 65 | 70% |
| W. C. Bryant | 60 | 130% |
| Cleveland | 76 | 181% |

Cleveland and Bryant, which are over 125% utilized, are included because they are presently designated as receiving schools (although not for Jackson or Erasmus).

\* \* \* \* \* \*

The number of minority students to be admitted to any one receiving school from Erasmus or Jackson in any one year shall (together with additional minority student enrollment which would result from other integration programs or demographic changes) not exceed that number which would result, in that year, in a change of (1) 4% in the school's white-minority ethnic balance or (2) one-fourth of the difference between the school's current white enrollment and a 50% white enrollment, whichever is lower.

While open admission and similar programs have always operated within certain limitations stemming from the effect on a receiving school's ethnic balance, degree of utilization, etc., this standard enunciates more objectively an approach which will ensure a more effective administration of controlled change in the ethnic balances of the receiving schools. By considering (1) the present degree of integration in a school, (2) its most recent rate of change as

a result of both demographic and other integration programs, (3) the effect over four years of any change which effects the current entering class (which presumably would be repeated for the next three entering classes) and (4) the recalculation each year of such a four year approach to take into account unexpected changes, the Board would be taking into account and, to the extent possible, controlling those elements which would provide an integration plan with the "greatest possible long-range validity" and "the greatest degree of stability consistent with true equality of educational opportunity for all students."

II. *Open Admission options to white students residing in the Erasmus Hall and Andrew Jackson attendance zones:*

White students in the Erasmus Hall and Andrew Jackson attendance zones will be provided the option (on an entering year basis) of attending any New York City high school (except the special high schools designated under Education Law § 2590–g(12)) in which the percentage of white students is lower than the borough-wide average in the borough in which the "receiving" school is located, or in which the percentage of white students is lower than 50% of the total school population, whichever is lower.

Under these criteria 33 high schools (10 in Brooklyn, 8 in the Bronx, 7 in Queens and 8 in Manhattan), all of which have predominantly Black and Hispanic enrollments, will be eligible to receive open enrollment assignments of white students residing in the Erasmus and Jackson zones. (see Attachment B).

It should be noted that the relatively few white students who resided in the predominantly minority Erasmus Hall feeder schools which had been given open admissions options, or in the Jackson choice of admissions zone, will have their available options modified to reflect those schools listed in Attachment B rather than those which might previously have been available to them as a result of the predominantly minority feeder school area in which they resided (i.e., some of the schools listed in Attachment A).

EXPANSION OF COOPERATIVE EDUCATIONAL PROGRAMS FOR STUDENTS AT ERASMUS HALL AND ANDREW JACKSON HIGH SCHOOLS

(a) *Erasmus School [sic] High School*

Erasmus Hall High School now has extensive cooperative programs with Brooklyn College, particularly in the performing arts and student teaching. Programs in the visual arts, music, dance and drama will be further developed.

In addition, the following *cooperative ventures* will be encouraged with high schools having greater white populations in order to provide interracial educational experience for the students at Erasmus Hall:

1. Occupational skills program:

   Students at Erasmus who wish to take courses in vocational subjects, on a part-time basis, will be permitted to take their academic subjects at Erasmus and vocational courses at vocational High Schools in the borough of Brooklyn.

2. Expansion of "Cooperative Education" Program. This is a program which is presently available at many Brooklyn High Schools, including Erasmus Hall. A student at Erasmus who chooses to participate in this program would attend classes at Erasmus in the morning and work in the afternoon at a private New York City company. At these jobs students from Erasmus are provided with the opportunity to work with students and adults of different races. This program *will* be further developed and expanded.

3. Expansion of High School Internship Program:

   This is a program whereby students now at Erasmus may choose to spend six months of the year working full time at a public or private agency, where they have the opportunity to meet with and work with

students and adults of different races. This program will be further developed and expanded. Cooperatively planned community enhancement programs, such as neighborhood cleanups, historic restorations, etc.

5. After-school career training and skills development programs in which high schools from different parts of the borough will participate.

6. Participation in ongoing and newly developed consortium programs through which a number of high schools cooperatively plan such undertakings as:

   (a) curriculum design and redesign

   (b) strengthening the senior year programs

   (c) developing improved articulation with the lower schools and colleges.

7. Participation by Erasmus students in regional or city-wide choral and orchestral performances, and in arts and crafts exhibitions and expositions.

8. Sharing ideas on improving intergroup relations at weekend workshops and conferences attended by students of several schools, sponsored by Peer Group and other educational agencies.

9. Joint inter-school journalistic and publication endeavors.

10. Expansion of inter-school sports programs between students from Erasmus and other Brooklyn High Schools.

11. Joint inter-school journalistic and publication endeavors.

12. Development of additional partnership arrangements with such institutions as the City University units in Manhattan and Brooklyn and the Brooklyn Center of Long Island University.

13. Inclusion of Erasmus students in such programs as Close Up, when students from Brooklyn public and private high schools spend a week in Washington, D. C., getting to know the working of U.S. governmental processes.

(a) *Andrew Jackson High School*

In addition to the programs set forth in the plan submitted on March 17, 1976, which consist of a cooperative educational program with Queens College, a "law center" magnet at Andrew Jackson and expansion of the music and art program at Jackson, the following further steps will be taken to provide interracial educational experiences for the students at Andrew Jackson High School:

1. Occupational skills program:

   Students at Jackson who wish to take courses in vocational subjects, on a part-time basis, will be permitted to take their academic subjects at Jackson and vocational courses at Vocational High Schools in the borough of Queens.

2. Expansion of "Cooperative Education" Program: This is a program which is presently available at many Queens High Schools, including Andrew Jackson. A student at Jackson who chooses to participate in this program attends classes at Jackson in the morning and works in the afternoon at a private New York City company, such as Macy's, New York Telephone Company, etc. At these jobs students from Jackson are provided with the opportunity to work with students and adults of different races. This program will be further developed and expanded.

3. Expansion of High School Internship Program:

   This is a program whereby students now at Jackson may choose to spend six months of the year working full time at a public or private agency, where they have the opportunity to meet with and work with students and adults of different races. This program will be further developed and expanded.

4. Cooperatively planned community enhancement programs, such as neigh-

borhood cleanups, historic restorations, etc.

5. After-school career training and skills development programs in which high schools from different parts of the borough will participate.

6. Participation in ongoing and newly developed consortium programs through which a number of high schools cooperatively plan such undertakings as:

(a) curriculum design and redesign

(b) strengthening the senior year programs

(c) developing improved articulation with the lower schools and colleges